# W. A. BEARDSLEY, Respondent, v. JOHN EWING and Fred Ewing, Copartners as Ewing & Ewing, Appellants.

### (168 N. W. 791.)

**Malpractice — damages — action to recover — negligence — evidence held to present question — one of fact — for jury.**

1. In an action for the recovery of damages for malpractice, the evidence is examined and *held* to present a question of negligence as one of fact for the determination of a jury.

**Size of an abscess — observable to naked eye — laymen — competent to testify as to.**

2. It is *held* that a layman is competent to testify to the size of an abscess which can be observed with the naked eye.

**Malpractice suit — defendants in — insured against consequences of their practice — improper questions as to — objections to sustained — prejudicial effect of such questions — matter in first instance for court — circumstances disclosed by record.**

3. Where improper questions are asked for the purpose of showing that the defendants in a malpractice suit are insured against the consequences of the action to which objections are sustained, the prejudicial effect of the asking

---

NOTE.—That a physician or surgeon must exercise such reasonable skill and diligence as are ordinarily exercised in his profession and which is ordinarily required by the community, and must exercise his best judgment in the application of his skill and the application of his diligence, will be seen by an examination of authorities collated in notes in 37 L.R.A. 830, and L.R.A.1915C, 598, on degree of care and skill which a physician or surgeon must exercise.

See also note in 38 Am. St. Rep. 30, on degree of skill and care required of physician or surgeon.

of the questions is a matter, in the first instance, for the consideration of the trial court. It is *held* that the improper suggestions of the liability insurance under the circumstances disclosed by the record are not reversible errors.

Opinion filed August 10, 1918.

Appeal from judgment and from an order of the District Court of Ward County, North Dakota, Honorable *K. E. Leighton,* Judge.

Affirmed.

*Bosard & Twiford, Greenleaf, Wooledge, & Lesk,* and *Murphy & Toner,* for appellants.

A physician is answerable for any injury resulting from the failure to perform his implied contract, and for failure to exercise his best judgment. Langdon v. Humphrey, 9 Conn. 209, 23 Am. Dec. 333; Barnes v. Means, 82 Ill. 379; Beck v. Klinik (Iowa) 7 L.R.A. 566, 43 N. W. 617; Moratsky v. Wirth (Minn.) 69 N. W. 480, 76 N. W. 1032; Boldt v. Murray (N. Y.) 2 N. Y. S. 232, 21 N. E. 1116; Allen v. Voje (Wis.) 89 N. W. 924.

A physician, in the absence of special contract, is not obliged to use the highest degree of care and skill, but only that ordinarily used by physicians and surgeons in the same general line of practice in the same or similar locality. Burke v. Foster (Ky.) 59 L.R.A. 277, 69 S. W. 1096; Howard v. Grover, 15 Me. 97, 48 Am. Dec. 478; Patten v. Wiggin, 51 Me. 594, 31 Am. Dec. 893; Pekly v. Palmer (Mich.) 67 N. W. 561; Small v. Howard, 128 Mass. 131, 35 Am. Rep. 363; Barney v. Pinkham, 26 Am. St. Rep. 389 and note (Neb.) 45 N. W. 694; Baker v. Hancock (Ind.) 63 N. E. 323; Thomas v. Dabblemont (Ind.) 67 N. E. 463; Whitesell v. Hill (Iowa) 37 L.R.A. 830; Dunvauld. v. Thompson (Iowa) 80 N. W. 324; McCracken v. Smathers (N. C.) 29 S. E. 354; Dorris v. Warford (Ky.) 9 L.R.A.(N.S.) 1090.

The burden of proof is on the plaintiff to show that the physician is guilty of negligence in that he did not use the required care and skill according to his implied contract. Ballou v. Prescott, 64 Me. 305; Chase v. Nelson, 39 Ill. App. 53; Craig v. Chambers, 17 Ohio 253; Holtzman v. Hoy (Ill.) 59 Am. Rep. 390, 8 N. E. 832; Martin v. Courtenay (Minn.) 91 N. W. 487; Stanley v. Taylor (Iowa) 142 N. W. 81; State v. Housekeer (Md.) 2 L.R.A. 587, 4 Am. St. Rep.

340, 16 Atl. 382; Whitesell v. Hill (Iowa) 37 L.R.A. 830, 66 N. W. 894.

The mere failure to cure, or any unsuccessful treatment, does not raise the presumption of negligence. Jackson v. Burnham (Cal.) 39 Pac. 577; Sims v. Parker, 41 Ill. 284; Lawson v. Conoway (W. Va.) 18 L.R.A. 627, 38 Am. St. Rep. 17, 16 S. E. 564; Tomer v. Aiken (Iowa) 101 N. W. 769.

The doctrine of *res ipsa loquitur,* that is, that the injury itself is evidence of negligence, does not apply in a suit against a physician for civil malpractice.

The injury, failure to cure, bad results, failure to recover, deformity, failure of diagnosis, death, or any other circumstances showing lack of success, is not evidence of negligence, and negligence cannot be inferred from the same. Bonnett v. Foote (Colo.) 28 L.R.A.(N.S.) 136, 107 Pac. 252; Brown v. Marshall (Mich.) 41 Am. Rep. 728, 11 N. W. 392; Ewing v. Goode, 78 Fed. 442; Feeney v. Spalding (Me.) 35 Atl. 1027; Staloch v. Holm (Minn.) 9 L.R.A.(N.S.) 712, 111 N. W. 264; Tomer v. Aiken (Iowa) 101 N. W. 769.

A physician is not liable for mere errors of judgment, such judgment being based upon the exercise of the required care and skill. Bonnett v. Foote (Col.) 28 L.R.A.(N.S.) 136, 107 Pac. 252; Hills v. Shaw (Or.) 137 Pac. 229; Luka v. Lowrie (Mich.) 136 N. W. 1106; Wells v. Dispensary (N. Y.) 24 N. E. 276.

A physician is not liable for a mere error or mistake in making a diagnosis, provided he uses that degree of care, skill, and judgment which is required of him to perform his implied contract. The same rule applies for failure to discover malady or ailment. Bonnett v. Foote (Colo.) 28 L.R.A.(N.S.) 136, 107 Pac. 252; Ely v. Wilbur (N. J.) 60 Am. Rep. 668, 10 Atl. 358; Pike v. Honsinger (N. Y.) 32 N. Y. S. 1149, 63 Am. St. Rep. 655, 49 N. E. 760.

A physician's negligence can only be predicated upon his failure to do what he should have done, or in doing what he should not have done, in a negligent manner. Whether or not the conditions of which complaint is made were the result of a physician's negligence is a question which can only be determined by witnesses *qualified to speak,*—that is, by physicians and surgeons acquainted with the methods and treatments adopted and applied, and not by mere laymen. Hence unless

there is testimony of physicians showing negligence, no judgment can be sustained. Staloch v. Holm (Minn.) 9 L.R.A.(N.S.) 712, 111 N. W. 264; Ball v. Skinner (Iowa) 111 N. W. 1022; Farrel v. Haze (Mich.) 122 N. W. 197; Booth v. Andrus (Neb.) 137 N. W. 884; Williams v. Nally (Ky.) 45 S. W. 874; O'Hare v. Wells (Neb.) 15 N. W. 722; Robinson v. Crotwell (Ala.) 57 So. 231, 2 N. C. C. A. 386; James v. Robertson, 117 Pac. 1068; Shelton v. Hacklip, 167 Ala. 217; Ewing v. Goode, 78 Fed. 444; Woodward v. Hancock, 52 N. C. 384.

Defendants were not bound by testimony which, in itself, would hold them to a higher degree of care and skill than they were by law required to render, or to possess, under the circumstances. Pike v. Hunsinger (N. Y.) 63 Am. St. Rep. 655; Gale v. Fleischer (Wis.) 30 N. W. 674; Walhort v. Seibert, 22 Pa. Super. Ct. 213; Burke v. Foster (Ky.) 59 L.R.A. 277, 65 S. W. 1096; Barney v. Pinkham (Neb.) 26 Am. St. Rep. 389, 45 N. W. 694; Getchell v. Hill, 21 Minn. 464; Small v. Howard (Mass.) 35 Am. Rep. 363.

The admission of evidence to prove that defendants carried insurance indemnifying them against loss is prejudicial error. No such testimony bears on the question of negligence, the only real issue, and its admission was highly prejudicial before the jury. Lawset v. Seattle Lumber Co. (Wash.) 80 Pac. 431.

We think that to allow juries in cases of this kind to take into consideration the fact that an employer was insured against accidents would do more harm than good, and would increase the already strong tendency of juries to be influenced in cases of personal injury, especially where a corporation is defendant, by sympathy and prejudice. Sawyer v. J. M. Arnold Shoe Co. (Me.) 38 Atl. 33; Walters v. Appalachian Power Co. (W. Va.) 84 S. E. 617; N. W. Fuel Co. v. Minneapolis St. R. Co. (Minn.) 159 N. W. 832; Levinski v. Cooper (Tex.) 142 S. W. 959; Hersford v. Carolina Glass Co. (S. C.) 75 S. E. 533; Inland Steel Co. v. Gillespie, 104 N. E. 76.

In an action by a servant for damages for personal injuries, repetition by plaintiff's counsel as to whether defendant was not insured in an employer's liability company is sufficient to reverse the verdict. Westby v. Washington Brick Lime & Mfg. Co. (Wash.) 82 Pac. 271; Iverson v. McDonnell (Wash.) 78 Pac. 202.

"Where questions touching insurance are improperly asked, with the intent to get before the jury a fact not material to the case, the court should penalize the party guilty of such misconduct, by discharging the jury." Marrigold v. Black River Traction Co. 80 N. Y. Supp. 861; Tuohy v. Columbia Steel Co. (Or.) 122 Pac. 36; Mithen v. Jeffrey (Ill.) 102 N. E. 778; Rodzborski v. Am. Sugar Ref. Co. 210 N. Y. 262; Trembly v. Hamden, (Mass.) 38 N. E. 972; Chicago, etc., R. Co. v. Mines (Ill.) 77 N. E. 898.

Such matters are prejudicial if brought to the attention of the jury in any form. Hocks v. Sprangers (Wis.) 87 N. W. 1101; Rudd v. Rounds (Vt.) 25 Atl. 438; Cargill v. Com. (Ky.) 13 S. W. 916.

*Bradford & Nash,* for respondent.

Courts have frequently held that the doctor is not required to have and use a greater degree of skill than is usually and ordinarily had and used in similar localities, and we suppose this may be regarded as the general rule. But the court should bear in mind that when this rule was adopted the practice of medicine was, to a large extent, local in its nature, and surgery, when viewed from the modern standard, was unknown.

The rule should now be applied with the advancement made in professional learning always in mind. Hitchock v. Bergett, 38 Mich. 501.

In every case cited by counsel where a reversal was had because of evidence showing that defendants were insured against loss, or where reference in the examination of witnesses was made thereto, it appeared to the court that counsel had proceeded and persisted on this course from wrongful and improper motives. No such claim was here made, nor could it be made. Tuohy v. Columbia Steel Co. (Or.) 122 Pac. 36.

BIRDZELL, J. This is an appeal from a judgment in favor of the plaintiff, and from an order denying a motion for a new trial entered in the district court of Ward county in an action to recover damages for negligence in the treatment of an injured eye. The facts are as follows: .

The plaintiff, while engaged at his occupation as an engineer, on December 19, 1914, got a cinder in one of his eyes. After complet-

ing his run and just before going to bed at about 11 o'clock on the same evening, he endeavored to remove the cinder by taking an ordinary match, burning the head off, and attempting to brush the cinder out with the charred end of the match stick. It was so deeply embedded in the eyeball, however, that he could not remove it. Next morning he went to the offices of the defendants in Kenmare, where the cinder was removed by Drs. John Ewing and Grogan. His eye was not bandaged and when the defendants offered the plaintiff a prescription for a boric-acid solution, he replied, in substance, that he could get it himself without a prescription. At 2 o'clock in the morning of the following day, he was called to go to work, and as his eye was causing him considerable pain he refused to go to work and later went again to the offices of Drs. Ewing & Ewing. He saw Dr. John Ewing at about 11 o'clock, Dr. Fred Ewing, who was the local physician for the Soo Road, having gone to the country. In treating the eye at this time the doctor applied a bandage and gave to the plaintiff a prescription for a solution of argyrol. The plaintiff went again to the offices of the defendants on the morning of the 22d of December at 8 o'clock. Upon this visit he was seen by Dr. Fred Ewing, who told him that he should go at once to the head eye surgeon of the Soo Railway Company in Minneapolis. Transportation was secured for the plaintiff and for Dr. Grogan who was to accompany him on the trip. They took a train for Minneapolis at about noon on December 22d, and upon arrival the eye was promptly treated by Dr. Benson. The scar resulting from the operation which was rendered necessary by the infection was located directly over the pupil and resulted in total blindness in the affected eye. In the trial of the action the plaintiff recovered a judgment for $7,933.50.

The principal error relied upon for a reversal of the judgment is the refusal of the trial court to direct a verdict for the defendant on the ground of the insufficiency of the evidence to establish the negligence of the defendants. There is considerable conflict in the testimony relative to the time when the infection upon the plaintiff's eyeball first became visible; also as to whether or not the plaintiff had been advised early in the progress of the treatment that he should go to Minot to Dr. McCannel, a specialist, for attention. In so far, however, as the evidence upon these matters may be regarded as having

a bearing upon the verdict of the jury, we must, upon this appeal, regard the plaintiff's version as being true. Moreover, it should be observed that the circumstances strongly support the plaintiff's version as to the early appearance of the infection. Both the plaintiff and his wife testified that there was a small yellowish spot on the eyeball on the morning of the 21st of December, and both also testify that Dr. John Ewing stated on that morning that the eye was infected. In addition to this, it appears that some five or six months after the plaintiff was treated by the Ewings, Dr. John Ewing wrote a letter on behalf of the plaintiff to one Borene, of Thief River Falls, Minnesota, purporting to state the facts relative to the plaintiff's injury, in which he said that the eye was infected at the time he first treated it. The letter is as follows:

"Kenmare, N. Dak., 5/8, 1915.

M. A. Borene, Sec.
        Thief River Falls, Minn.
Dear Sir:—

This is to state that one M. A. Beardsley came to me on December 20th with a foreign body deeply embedded in the right eye, which was removed. The eye showed some infection at the time, which was very bad in a day or two, when he was sent to Minneapolis for further care.

Yours truly,
                                            John Ewing, M. D.

In explaining the above letter, Dr. Ewing testified that he wrote it for the purpose of helping the plaintiff out in an insurance matter. In the state of the testimony as to the first appearance of the infection, the jury could well have found, as it probably did find, that the eye bore appearance of infection at least as early as the morning of December 21st. As to advising the plaintiff to go to Minot for treatment with a specialist there, the jury could well have believed the plaintiff's testimony when he denied that any such suggestion was made to him or direction given.

The issue on this phase of the case is thus narrowed down to the question of negligence in the treatment. The evidence offered by the

plaintiff on this subject is the testimony of Dr. George E. Benson, of Minneapolis, who treated the plaintiff and who had for some time practised as a specialist in the diseases of the eye, ear, nose, and throat. He testified that, at the time the plaintiff came to him for treatment, which was on December 23, 1914, the eye was in such condition that it was his first duty to endeavor to save the eyeball from being destroyed by the infection, and, if successful to this extent, he should next do as much as could be done toward saving the sight of the eye. He testified, further, that the infection from which the plaintiff was suffering was in the nature of a hypopian ulcer or one which forms pus in the anterior chamber of the eye; that the development of an ulcer of the particular class to which this belonged is ordinarily very rapid; and that the proper course for a general practitioner, after infection has been discovered, is to send the patient to a specialist unless the practitioner has confidence enough in himself to take care of it. He stated that, while the proper course would be to send the patient to a specialist, if the practitioner is determined to treat the case himself, the first proper thing to do is to cauterize the ulcer; but that, if the ulcer has reached the stage when it shows infiltration underneath the layers of the cornea, the cautery will not do any good and it is then necessary to make the Saemisch incision.

He testified, further, that one important fact bearing upon the indication of cautery is the location of the ulcer with reference to the pupil of the eye. To state it in his own words:

There is a line there that you can't draw, there is a time when there is a balance, when it is very hard to say whether I shall use hot or cold applications on this eye or shall I cauterize it. If you cauterize, you have to make up your mind to one thing; that is, there is going to be a scar. If that ulcer is on the center of the eyeball and a man comes in with that ulcer, shall I cauterize it or will it get well without? It might get well without it. Waiting until to-morrow morning or a few hours might not make much difference, but if it showed any sign of spreading you would then have to cauterize and take the scar as it comes.

Q. You have referred to hot or cold applications. Would that

be proper practice in the treatment of this ulcer before infiltration started, in case the ulcer was in the center of the eye?

A. Before infiltration, no. If you use anything at all, your cold application would be best, but, as a rule, we don't need anything when we take a cinder out of an eye.

Q. Just to get this matter as clear as we can, by infiltration just what do you mean?

A. Infiltration is when this yellow matter begins to show on the eye, a yellow point begins to show as you have referred to.

Q. When the yellow point begins to show on the cornea at the point where the cinder or foreign substance has been removed, assuming that that point is not over the pupil of the eye, what is the proper practice?

A. We usually wait to see what the developments are. We don't want to cauterize unless it is necessary because we surely will have a scar. On the other hand, we don't want to neglect it if it needs some treatment, and about all we can do is to watch the eye at that stage of the game.

Q. After the infection is apparent?

A. Yes, it is possible that one can have a yellow point on the cornea and have it remain, and not spread, but we get worried if we see it; we tell him to come to-morrow morning early, we want to see him the first thing; and when he goes home to-night if he has pain to use hot applications on the eye if it keeps him awake. If it doesn't keep him awake but bothers some, keep it covered, but do not rub it. That is a very hard question that cannot be answered by any particular rule that can be laid down for treatment.

Q. After the removal of a cinder from the cornea, having used cocaine to deaden the sensation, what is the usual, ordinary, and proper practice relative to covering the eye by a bandage or other appliance?

A. In most cases we cover the eye.

As bearing further upon the nature of the infection and the proper practice in such a case as the one at bar, the witness testified as follows:

Q. Is it, in any event, proper practice to allow an ulcer such as the

one in this case, to spread from a mere pin point until the entire
cornea is involved, or nearly so, before either sending the patient to
a specialist or performing a cautery?

A. They spread so rapidly sometimes that over night you can have
an ulcer involve almost the whole cornea.   It depends upon how much
infection there is.   It just simply lifts the layers of the cornea right
up and pushes everything in front of it.   It may be very rapid, so
rapid that there are no other ulcers that we see that worry us more
than these.

Q. Assuming that at the initial visit to the physician, the physician
discovered that there was infection in the wound, caused by the cinder
in the cornea, is it usual, ordinary, or proper practice, having discov-
ered the infection and knowing it to be there, to allow the patient to
go out with his eye unbandaged and with no instructions other than
if it bothered him to wash it out with boric acid?

A. The eye should be covered if the infection has already started.

Q. And is it not proper when an ulcer is discovered to wait until
there is sign of it spreading, before cauterizing, and take the chance
that it may recover without any progression at all?

A. We cauterize an ulcer just as soon as we see it, providing it is
in a location where we think it is not going to interfere with vision.
We don't take any chances.   Sometimes we have to take a chance, and
we tell the patient that they have an ulcer that we may have to cauter-
ize, but we don't like to do it unless a case of absolute necessity, and
we will order them in the next day and tell them to be very careful,
tell them all the consequences, and as a rule when you tell them all
the dangers, with only a little foreign body as they think, they go to
the other fellow; because they have had lots of cinders in their eyes
before and this fellow is absolutely crazy.

He also testified that a general practitioner would be treading on
pretty dangerous ground in taking chances on the spread of an infec-
tion after an ulcer of the cornea has developed.   When the above
testimony is considered in the light of the facts above mentioned and
the further fact that the infection first appeared not over the pupil
of the eye, but a little below, we are satisfied that there was evidence

from which the jury was warranted in finding the defendants negligent in not using the proper treatment at the proper time.

The defendants, however, rely upon the rule that a physician is held only to the exercise of the skill and learning of the profession generally in the community in which he practises, and that there is no evidence going to show that the defendants did not conform to such a standard of skill in the instant case. As we view the case, however, the defendants do not properly invoke the rule here. According to their own testimony, the defendants recognized the necessity of more expert treatment than general practitioners are capable of giving. It must be borne in mind that it was at the suggestion of Doctor Fred Ewing that the plaintiff ultimately went to Minneapolis for treatment by specialists, and according to the pathological conditions described by the witness and mentioned above, this direction should have been forthcoming from the defendants at least twenty-four hours before it was given. Furthermore, the testimony of the defendants Ewing themselves indicated that they were aware of the dangers incident to the spread of an infection of the character of that in question, and knew of the inefficiency of the ordinary so-called disinfectant eyewashes in the treatment of such cases. Yet, boric acid and argyrol were all that were prescribed by them, according to their own testimony. In this state of the record, the jury was justified in finding that the proper degree of care was not exercised in the instant case.

The appellants argue that error was committed in allowing the plaintiff to testify to the size of the abscess on the eye on the 22d of December, when Dr. Ewing looked at it, in comparison with the size of the scar as it appeared at the time of the trial. The objection was that the testimony was in the nature of a conclusion, inasmuch as the fact is one which called for expert testimony. This objection is clearly without merit, as it was competent for the plaintiff as a layman to give to the jury the benefit of his own observation. The abscess could, of course, be observed by him, as could also the scar with which he was asked to compare the same.

It is contended that the court erred in permitting the plaintiff to testify that the railway company would no longer employ him as an engineer. This testimony was clearly competent, as the plaintiff would be in a position to know whether he would be permitted to con-

tinue in his employment after he had lost the sight of one eye. If his answer was too broad, the correct situation could doubtless have been disclosed by a proper cross-examination or by other evidence.

The specifications of error based upon the refusal of the trial court to sustain objections to questions asked of the witness Dr. Benson are so obviously without merit that they require no discussion. The same is also true of the specifications relative to the sustaining of objections to certain questions asked of the defendants' witness Dr. Kermott.

It is next insisted that errors were committed in getting before the jury suggestions bearing upon the interest and credibility of certain witnesses, which were improper by reason of their prejudicial tendency. These suggestions were presented in three different ways: First, by a question directed to one of the defendants, Dr. Ewing, upon cross-examination, asking whether or not he was insured against loss in malpractice cases, and in also asking the same witness whether his brother was insured. The questions were objected to and the answers not given. The next alleged improper suggestion is contained in some questions asked of the witness Dr. Grogan, relative to whether or not his expenses were met by the Northwestern Medical Association, and as to whether or not counsel for defendants were employed by the Northwestern Medical Association. Objections were also sustained to these questions. The third alleged improper suggestion complained of is a statement made by plaintiff's counsel in his argument to the jury, wherein he said that "the manner in which these physicians stand together is disgraceful." As the question of the prejudicial effect of the above suggestions is presented upon this appeal, this court is confronted with the alternative of reversing a judgment in favor of the plaintiff wholly on account of the improper conduct of his attorney or of affirming the judgment entered upon a verdict which might have been more or less tainted with prejudice by reason of the alleged improper conduct. In determining this matter, we do not wish to be understood as in any way countenancing as proper, beyond the point herein indicated, any of the suggestions pointed out by the appellant. It is true that counsel for the respondent in his brief explained the reasons that led him to ask the questions and to make the statement to the jury; but this court is not inclined to consider the propriety of the questions upon any other basis than that consid-

ered below, or in the light of any explanation that was not presented
to the trial court at the time. The inherent vice of the objectionable
questions lies in their probable effect upon the minds of the jury.
The consideration as to whether or not the defendants are insured is
entirely foreign to the question of negligence; but the fact must be
conceded to have a bearing upon the interest of the defendants in the
outcome, and to belong to that class of matter which it is proper
ordinarily for the jury to consider in weighing the testimony of wit-
nesses. Yet the disadvantage due to its prejudicial tendency is sup-
posed to outweigh the value of the evidence as affecting the credibil-
ity, and it is for this reason excluded. Wigmore, Ev. § 969. See also
Iverson v. McDonnell, 36 Wash. 73, 78 Pac. 202; Stratton v. C. H.
Nichols Lumber Co. 39 Wash. 323, 109 Am. St. Rep. 881, 81 Pac.
831; Lowsit v. Seattle Lumber Co. 38 Wash. 290, 80 Pac. 431; Wild-
rick v. Moore, 66 Hun, 630, 49 N. Y. S. R. 919, 22 N. Y. Supp. 1119.
In fact, the rule of exclusion is so well understood in the profession
that there seems but little excuse for even asking such questions. It
is passing strange, too, that an attorney cross-examining hostile wit-
nesses should undertake to establish their lack of interest in the out-
come when ordinarily it would be to his interest to establish exactly
the opposite. This gives rise to the current suspicion, which is the
philosophy of the rule of exclusion, that the testimony is really offered
for its prejudicial effect upon the jury.

Where a fair trial of the issues in a damage suit is likely to be prej-
udiced by questions such as those pointed out, we are of the opinion
that their correction lies largely in the discretion of the trial court.
The trial judge, who has the advantage of the atmosphere of the
trial, can best determine the extent of the threatened prejudice, and
can take the necessary precautionary measures to insure a proper de-
termination of the issues,—even to the extent of granting a new trial.
Then, too, the defendant should not be given a free rein to speculate
upon the verdict. If it is thought that the jury is prejudiced by
reason of improper suggestions made during the trial, steps should
be taken at once to secure another trial before another jury. That
the interjection of such improper matter during the course of the
trial is not, under all circumstances, reversible error, see Edwards
v. Burke, 36 Wash. 107, 78 Pac. 610, 17 Am. Neg. Rep. 384; Shoe-

40 N. D.—25.

maker v. Bryant Lumber & Shingle Mill Co. 27 Wash. 637, 68 Pac. 380; Hammer v. Janowitz, 131 Iowa, 20, 108 N. W. 109, 20 Am. Neg. Rep. 324; Johnson v. Devoe Snuff Co. 62 N. J. L. 417, 41 Atl. 936, 5 Am. Neg. Rep. 191; Demars v. Glen Mfg. Co. 67 N. H. 404, 40 Atl. 902.

The statement made during the argument to the jury, though a rather vigorous characterization of defendants' witnesses, did not, in our opinion, pass beyond the bounds of legitimate argument. The jury could observe the extent to which the physicians who testified appeared to "stand together," and it was perfectly proper that they should take this matter into consideration in deciding upon the weight to be given their testimony.

On the whole record, viewed in the light of the foregoing observations, we are constrained to hold that the conduct referred to does not amount to reversible error. The judgment of the trial court is in all things affirmed.

GRACE, J. I concur in the result.

ROBINSON, J. (dissenting). On December 19, 1914, at 3 o'clock P. M., the plaintiff, a locomotive engineer on a Soo train, got a cinder in his eye when nearing Minot. Though he stopped about an hour in Minot he did not have it removed. He went right on to Kenmare, where he resided, and before retiring tried to remove it with the burnt end of a match. Next morning at 10 or 11 A. M., he went to the defendants, and they quickly removed the cinder in a satisfactory manner. The next morning, December 21st, he went to the doctor's office, got a prescription and used it. On the morning of December 23d, he saw Dr. Fred Ewing, who advised him to go to an eye specialist. He decided to go to the specialist of the company at Minneapolis though Dr. Ewing advised him to go to the eye specialist at Minot.

Dr. Grogan went with him to Minneapolis to care for him on the way. On arriving at Minneapolis, the eye was promptly operated on by Dr. Benson, the eye specialist of the company. The eyeball was saved, but the sight was lost. There is no claim that Dr. Benson is not a skilful and competent eye specialist, yet who can say that nature might not have saved the sight if there had been no operation on the

eye. Surgery is not an exact science. It is largely experimental, and often the most skilful doctors must take the chance of doing more harm than good. The result was an action against the defendants for malpractice and a verdict and judgment for about $8,000, from which they appeal.

It is claimed that after the removal of the cinder the doctors were negligent in not bandaging the eye, and in not cauterizing the wound, and in not giving the plaintiff better advice. But the plaintiff was a locomotive engineer in the meridian of life, a person of years and experience, and presumably of good common sense and common knowledge, and the defendants could not be expected to treat him as if he were a child. Indeed, it seems he had a mind of his own, and when they advised him to go to the specialist at Minot, he insisted on going to Minneapolis. When the rush of infection set in, the plaintiff might have gained time and possibly saved his sight by going to the specialist at Minot or at Fargo; but it seems he was set on going to Minneapolis, to the best specialist, and in doing so of course he took the chances.

The witnesses called by the plaintiff were himself, his wife, each of the defendants, and Dr. Benson. They really gave no proof of negligence or malpractice, while the testimony of eight expert witnesses called by defendants show that the practice of the defendants was entirely proper. Perhaps the most important testimony was that of the specialist, Dr. Benson, who was called by the plaintiff. It clearly shows the uncertain results of even skilful eye surgery and treatment, and that the defendants were not to blame for failure to cauterize the eye.

Questions by counsel for plaintiff:

Q. Doctor, before infiltration has started, but after infection has been discovered, the only proper practice is cauterization?

A. There is a line there that you can't draw, there is a time when there is a balance, when it is very hard to say whether I shall use hot or cold applications on the eye, or shall I cauterize it, or will it get well without? If you cauterize you have to make up your mind to one thing; that is, there is going to be a scar.

Then in regard to hot or cold applications he says:

As a rule we do not need anything when we take a cinder out of the eye.

Q. When a yellow point or infiltration begins to show on the cornea where the cinder has been removed, was it proper practice?

A. We usually wait to see what the developments are. We don't want to cauterize unless it is necessary, because we are sure to leave a scar. About all we can do is to watch the eye. This is a very hard question for me to answer without seeing a case. It is a question that cannot be answered by any particular rule that can be laid down for treatment.

Q. Infection from a wound is caused by direct contact with an infective agent? I don't suppose we could examine the tears of any person that we do not find them full of germs. In the tears of a normal patient I suppose I would find many germs, any of which might set up an infection. That is why we all dread the operation for cataract; not because we are afraid of infection from our own hands or from the bandages that we use, but because we have that one source of infection, the tears from the tear sack.

Q. Hence, to prevent infection, is it not proper in operations to prescribe an eyewash?

A. We very seldom do it, because patients will use a dropper, stick it into their vest pocket, later draw some medicine, drop it into the eye, and get infection in that way. We give drops only to relieve irritation, not to prevent infection.

Q. In any event, is it proper practice to allow an ulcer—as in this case—to spread from a mere pinhead point until the entire cornea is enveloped before performing a cautery?

A. They spread so rapidly sometimes, that over night you can have an ulcer involve nearly the whole cornea. It may be very rapid, so rapid that there are no other ulcers that we see that worry us more than these. There is a line you cannot draw as to when you should cover the eye and when you should not cover it. My experience with engineers is that they have so many cinders in their eyes and someone has taken them out with a tooth pick, it is pretty hard to persuade them to cover their eyes.

I have one ulcer that has just gotten well, where the ulcer came two

weeks after I took out a little cinder. Why this should have been I don't know, but the party was laid up for two months with it. The antiseptics that can be used in the eye are practically worthless as far as killing any germs are concerned. So far as using a germ killer, you cannot do it, because you irritate the eye when you do it. An ulcer may recover spontaneously.

It is needless to cite the testimony of the eight expert witnesses called by defendants. They all concur in testifying to the effect that the treatment of the eye was entirely proper. In regard to the manner of sterlizing the eye spud used to remove the cinder, Dr. John Emery and Dr. Grogan both testified positively that before using the spud, it was put into carbolic acid from three to five minutes and into alcohol and left to evaporate.

Dr. Benson clearly shows that wounds in the eye may not safely be cauterized or disinfected like wounds in other parts of the body, and that cauterization of the eye is sure to leave a scar, and that it should be resorted to only as a last resource. He shows the extreme difficulty in drawing the line and determining when it is proper to cauterize. It is certain that his testimony was disappointing to the counsel who called him as a witness for plaintiff, and the expert medical testimony was all against them. Hence, they argued to the jury in effect that the doctors were a bad lot; that they all stood together and contributed to an insurance against loss from malpractice. And, of course, that was gross error.

Clearly the judgment should be reversed and the action dismissed, because from the record it appears that there can be no evidence to sustain a verdict for the plaintiff.