[File No. 6638.]

HANS TVEDT, Respondent, v. DR. C. O. HAUGEN, Appellant.

(294 N. W. 183, 132 A.L.R. 379.)

Opinion filed September 9, 1940.    Rehearing denied October 23, 1940.

*Nilles, Oehlert & Nilles,* for appellant.

*T. H. H. Thoresen,* for respondent.

CHRISTIANSON, J. This is an action for damages for alleged malpractice of a physician. The case was tried to a jury, which returned a verdict in favor of the plaintiff. Judgment was entered pursuant to the verdict, and the defendant has appealed from such judgment.

The only question raised on the appeal is as to the sufficiency of the evidence. In the court below the defendant challenged the sufficiency of the evidence by motions to dismiss the action and for a directed verdict. The challenge is renewed here by appropriate assignments of error, supported by argument.

In determining the question of the sufficiency of the evidence on this appeal, the evidence must be considered in the light most favorable to the plaintiff. State ex rel. Brazerol v. Yellow Cab Co. 62 N. D. 733, 245 N. W. 382.

The evidence adduced upon the trial was substantially as follows:

On April 1st, 1937, the plaintiff, who was then about forty-nine years of age, was injured while doing chores on his farm near Larimore in Grand Forks county. The defendant was a practicing physician in Larimore, and the plaintiff was taken to the defendant for treatment for his injury. Plaintiff's injury proved to be a spiral fracture of the tibia and a rough transverse fracture of the fibula. The two fractures were approximately opposite each other between the lower and middle third of these bones in the left leg. The defendant examined the injury through a fluoroscope. He reduced the fractures and applied a splint. The next day he applied a plaster cast and took

an X-ray picture. Plaintiff remained at defendant's private hospital from about 8 P. M. on April 1st to 10 A. M. on April 3d, when he was permitted to go home. The defendant admonished the plaintiff to stay in bed for about thirty days. About two weeks later, the defendant went out to plaintiff's home and looked at the cast, but did not inspect it closely. Plaintiff stayed in bed for over thirty days, then used a wheel chair to get around in the house. On June 2d he came back to defendant's hospital, where the defendant took another X-ray picture and opened the cast by splitting it lengthwise. Defendant examined the plaintiff's leg and pronounced it fine and stated that there was a good callus forming. Defendant then put part of the cast back and wrapped gauze around it. At that time the plaintiff's leg was very sore and caused him pain. The defendant told the plaintiff he should walk with the aid of crutches. Plaintiff went home and followed the doctor's instructions. In the latter part of June the plaintiff again saw the defendant and told him that the leg was still sore and painful. The defendant applied heat through the medium of an electric pad and again told the plaintiff that the break was "coming fine" and that the callus was getting stronger. During the first part of July the plaintiff again saw the defendant. The defendant examined the leg, and a third X-ray picture was taken but this picture was not shown to the plaintiff. At that time the plaintiff, at the request of the defendant, put the leg on a chair and on a stool. The leg was "wobbly" and it sagged in the center. The plaintiff told the defendant that the foot was turning out, and he exhibited the manner in which this occurred. The defendant still advised the plaintiff that a good callus was forming and that the leg was "coming along fine." The plaintiff went home again, kept the ace bandage on, and used crutches until the latter part of July, when he started to use a cane. He was never able to put his full weight on the left leg. Between that time and the 17th of September the plaintiff saw defendant two or three times on the street in Larimore. The defendant inquired about the leg and the plaintiff stated that it was causing him pain. On September 17th the plaintiff again went to the defendant's office and informed him that the foot was turning out, that there was a sag in the leg and that it was even more pliable than the time before, that it was just like he had an extra joint between the knee and the ankle, and he demonstrated to the defendant

the condition of the leg. The defendant at this time examined the leg under a fluoroscope and the plaintiff paid the defendant for the services he had performed up to that time. Plaintiff asked the defendant what he thought of the leg and defendant said he thought it was all right. About two weeks thereafter the plaintiff decided to consult another doctor, and he went to a clinic at Crookston, Minnesota, and one Dr. Oppegard of that clinic examined the leg and said "You haven't anything and you never did have," and advised an operation. On returning home, the plaintiff went to the defendant and told him about the consultation with the doctor at Crookston and that the doctor there had said that the plaintiff didn't have anything and never did have, and that he was going to cut the leg open and cut off the ends of the bone and splice it and that the plaintiff would be in the hospital for some time. The defendant then said: "The Crookston doctors might be good doctors but they are not bone specialists. I would rather see you go to Dr. Fortin in Fargo because he is one of the best in the northwest and a man with a lot of experience in Rochester at the Mayo Clinic."

The plaintiff acquiesced in this suggestion and thereupon the defendant telephoned Dr. Fortin at Fargo and made an appointment with him to examine the plaintiff on the following day. On the following day the defendant accompanied the plaintiff to Fargo. On arrival there the plaintiff was taken to St. John's Hospital, an X-ray picture was taken of the leg, the plaintiff was at once put to bed and prepared for an operation which was performed on the following day. When Dr. Fortin performed the operation he found that the fibula had united and that there was a nonunion of the tibia. He testified that the normal healing period for a fracture of both bones of the leg was from six to eight weeks. He stated that the early treatment given by the defendant, including the application of a cast and instructions to the patient to stay in bed for thirty days, was proper. He stated that the cast should be permitted to remain on from six to eight weeks, and that it then was proper to remove the cast in order to make an examination of the progress of healing. Dr. Fortin examined the three X-ray pictures taken by the defendant on April 2d, June 2d, and July 5th. With regard to the second picture he testified that it showed little callus; that it would be proper treatment at that time to immobilize

the leg longer and instruct the patient to walk around with the aid of crutches, bearing some weight on the injured leg. He testified that the third X-ray picture indicated that nature had not thrown down callus in the process of healing the fractured tibia, although the fibula appeared to be united.

He testified further:

"Q. Now, Doctor, at the time indicated on Exhibit C, what is the usual and ordinary course or line of treatment at this time?

"A. Well, given this fracture as we saw it—this is three months afterwards?

"A. That is three months afterwards, yes.

"Mr. Nilles: It is three months and twelve days. It is over three months.

"Mr. Thoresen: July 5th is the exact date, I think.

"Mr. Nilles: I think it was July 12th. Anyway, it is over three months.

"Mr. Thoresen: Yes.

"A. Well, given a fracture of both bones of the leg we consider the normal healing period of the fracture of both bones of the leg from six to eight weeks, and when the fractures do not unite in the normal period for that given fracture then we consider that a delayed union. That is, there is something slow about anyone throwing down callus. And at the end of three months or more, when this one was taken, there is so little callus present there is some reason why nature hasn't solidified that. I don't know enough about that to know why it doesn't throw down callus—sometimes it will throw down an awful lot—sometimes too much—but on this occasion the callus hadn't shown up.

"Q. What is the usual and ordinary treatment at that stage, as you have seen in Exhibit C?

"A. *We know we have a delayed union or coming to a nonunion.* What you do after that—sometimes it doesn't make an awful lot of difference whether you put a cast on or a splint or weight bearing— whether that tibia is ever going to unite, we don't know.

"Q. Answer my question. In the usual and ordinary course or line of treatment given the patient at the time as indicated on Plaintiff's Exhibit C, what should be done?

"A. There is no set course for that. You might treat that leg with-

out a cast or you might put another cast on it or splint, or you might operate and put new bone in there and try to make nature throw down callus. There is no one set way of doing that."

Objections were sustained to questions seeking to elicit from Dr. Fortin answers relative to the operative method of treatment.

Concerning the operation performed upon the plaintiff, Dr. Fortin testified:

"An incision was made down over the large bone of the left leg over the nonunion area and the material between the ends of the bones was removed and after the material between the ends of the bones was removed the ends of the bones were sawed off because the ends of the bone are usually just as hard as ivory, so we saw off the ends and get the ends of the bones together. When we have the ends of the bones so they are bleeding in good shape then we take an electric saw and saw out a piece of bone making a groove about half an inch wide and then slide this large bone over the other bone at the site of the nonunion."

"Q. You say you had to saw off the ends of the bone, why?

"A. The area between the bones was filled up with some scar tissue or fibrous tissue and the ends of the bone were hard.

"Q. What caused the hardness of the ends of the bones?

"A. You get that in nonunion because the two bones hadn't grown together and nature forms a hard shell around the ends of the bones that don't grow together."

On cross-examination, Dr. Fortin testified:

"Q. Doctor, from what you know about this fracture and having seen the X-rays you would consider this a very difficult fracture to handle, wouldn't you?

"A. Yes, sir.

"Q. What about the particular site of this fracture and this particular kind of fracture, is that one of the spots where nonunions are found more frequently than others?

"A. Yes, they are very common.

"Q. A nonunion at this particular site of this particular fracture, where there is a deficient blood supply to this particular area, is one of

the things the medical profession thinks may be one of the causes of these nonunions, is it not?

"A. Yes, sir.

.    .    .    .    .    .    .    .    .    .

"Q. After you have had an established nonunion, Doctor, where the leg is gone three months or more and you have a very slight callus and a very slight bony union, in fact no bony union at all is shown here according to the evidence, the chances of getting bony union thereafter, *except by operation, is wholly speculative?*

"A. Most of the time, yes.

"Q. In other words, you would say, whether a cast was applied or splints or any of these different methods as outlined for treatment were used, after three months have gone by, whether you would get union is both speculative and conjectural, is it not?

"A. Yes.

"Q. You may treat it one way and not get union?

"A. Yes.

"Q. And you may treat it another way for a while and still not get union?

"A. Yes, I have done that.

"Q. And this particular injury here, at that time, July 5th or 12th, you would say from your observation of the case—from what you have seen and heard—that the chances of getting union from the application of a cast or splints or heat or any of these things you mentioned, the chances of getting union are both conjectural and speculative?

"A. Yes.

"Q. And where you have tried these things and you are not getting solid union, *the operative method is the only way?*

"A. Yes.  Or leave it alone and wear a brace as some people do."

Dr. Fortin further testified "after three months we know we have a nonunion or a delayed union."  Also, that he thought there would be a perfectly good union as a result of the operation.

In the complaint it is alleged, "that the said defendant in attempting to diagnose, treat, heal, set, attend, and cure the said injury did negligently and carelessly fail to diagnose the said injury correctly or at all, and negligently and carelessly failed to set said broken limb so that a jointure or connection was made of the broken bone and carelessly

and negligently failed to place the said broken bones so as to unite the same. That the defendant carelessly and negligently failed to investigate, examine, and care for said broken leg after the said attempted first treatment, for a period of over three months and carelessly and negligently failed to determine if said bones were properly set and united. . . . That three months after defendant first treated the same, and after examining the said broken leg, the defendant informed this plaintiff that the injured limb was coming along all right and was in good condition and that it was properly set and joined and was healing, thereby deceiving this plaintiff into continuing under the care and treatment of this defendant, when this defendant should have known if proper, regular, and careful examination and treatment had been given, that the said broken limb had not united and never had been correct."

In our opinion the evidence in this case is clearly sufficient to sustain the verdict.

The relation between a physician and a patient "is a consensual one wherein the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient."

"The foundation of the relation is laid on the theory that a physician is one experienced and skilled in those subjects about which the ordinary layman knows next to nothing and in which he has most interest, subjects relating to his health and the health of his family. The ignorant and ailing layman ordinarily relies implicitly on the word of the physician and follows professional advice in detail." 21 R. C. L. p. 375.

It naturally follows that "it is the duty of a physician to act with the utmost good faith toward his patient, and if he knows that he cannot accomplish a cure, or that the treatment adopted will probably be of no benefit, it is his duty to advise his patient of these facts, and if he fails to do so he is guilty of a breach of duty. Likewise, if the physician represents to the patient that he can be cured, without knowledge whether the representation is true or false, and the patient accepts treatment in reliance thereon, and is not cured, the physician is liable in an action for deceit." 48 C. J. p. 1133.

While it is a general rule of law that a statement which amounts to an expression of opinion, even though erroneous, does not furnish

ground for action, there is an exception to this rule in cases where the reasons for its existence do not apply.

"Such an exception does exist in those cases where an opinion is expressed with intention to deceive, and where the other party has a right to rely upon the opinion; and also in cases where the facts are not equally known to both parties, but where the opinion is expressed by the one party and is founded upon special skill or knowledge by which he alone is able to form an opinion.

"The expression of an opinion by a physician and surgeon relative to the subject of his profession comes peculiarly within the exception, and we therefore shall expect to see him held responsible for any deceit or misrepresentation." Taylor, The Law In Its Relations To Physicians, p. 353.

"The doctor, with his skill and ability, should be able to approximate to the truth when giving his opinion as to what can be done with injuries of one year's standing, and he should always be able to speak with certainty before he undertakes to assert positively that a cure can be effected. If he cannot speak with certainty, let him express a doubt. If he speaks without any knowledge of the truth or falsity of a statement that he can cure, and does not believe the statement true, or if he has no knowledge of the truth or falsity of such a statement, but represents it as true, of his own knowledge, it is to be inferred that he intended to deceive. The deception being designed in either case, and injury having followed from reliance upon the statements, an action for deceit will lie." Hedin v. Minneapolis Medical & Surgical Institute, 62 Minn. 146, 64 N. W. 158, 35 L.R.A. 417, 54 Am. St. Rep. 628.

As said, the complaint in this case alleged as a breach of duty of the defendant to the plaintiff that three months after the plaintiff came under defendant's care after examining the broken leg, the defendant informed the plaintiff that the injured limb was coming along all right, that it was in good condition and was properly set and healing, and thereby deceived the plaintiff into continuing under the care and treatment of the defendant, when the defendant should have known, if proper regular and careful examination and treatment had been given, that the said broken limb had not united and never had been correct. The evidence in this case clearly justified the conclusion that

the defendant deceived the plaintiff both in July and in September and at times in between when he told him that the leg was coming along fine and that everything was all right. According to the testimony of Dr. Fortin, the fracture was a very severe one, and was located in an area where nonunion, if treated according to the methods which the defendant had utilized, was not at all unlikely and he must have known in July and in September that there was no union and that union was unlikely. Notwithstanding this, he did not inform the plaintiff of the seriousness of the situation. He stated to him something which was untrue. Plaintiff's leg was not getting along fine, but quite the contrary. Defendant must have known, or should have known, that there was something wrong about it. He did not inform the plaintiff as to his true condition. Neither did he inform him as to another method of treatment that was accessible, within easy reach. According to the evidence the defendant recognized at once when he was informed of plaintiff's consultation with Dr. Oppegard at Crookston, that the situation required the services of a bone specialist, but he had never called this to the attention of the plaintiff before. See Beardsley v. Ewing, 40 N. D. 373, 382, 383, 168 N. W. 791, 793, 794. The duty of a doctor to his patient is measured by conditions as they exist, and not by what they have been in the past or may be in the future. Today, with the rapid methods of transportation and easy means of communication, the horizons have been widened, and the duty of a doctor is not fulfilled merely by utilizing the means at hand in the particular village where he is practicing. So far as medical treatment is concerned, the borders of the locality and community have, in effect, been extended so as to include those centers readily accessible where appropriate treatment may be had which the local physician, because of limited facilities or training, is unable to give.

This court has held that a doctor does not perform his duty to his patient when he fails to employ available and well-known means of diagnosis such as the taking of X-ray photographs, even though no X-ray machine is available in the village where he is practicing, but where one is available at some point within easy access. Whitson v. Hillis, 55 N. D. 797, 215 N. W. 480.

When plaintiff reported to the defendant the result of the consultation with the doctor at Crookston, the defendant at once made arrange-

ments to have plaintiff taken to Fargo. He accompanied him there. After an X-ray picture was taken at Fargo, steps were taken to have an operation performed immediately. This was only some two weeks after the defendant had told the plaintiff that everything was all right and that his leg was coming along fine. He told him this in July in spite of the fact that the X-ray picture taken on July 5th showed that there was a nonunion. He told him the same in September, although the condition of the leg was substantially the same as it was in July. According to the testimony of Dr. Fortin, elicited on cross-examination by defendant's counsel, the chances of getting a union as disclosed by the photograph taken the first part of July was "both conjectural and speculative," and the only way of getting a solid union was by operation, and the other alternative was to abandon the idea of obtaining a union and to wear a brace.

The defendant not only failed to inform the plaintiff as to the true condition of the broken bones as shown by the X-ray photographs, but made inaccurate and misleading statements concerning the same,— statements that naturally would lead the plaintiff to believe that the condition of the injured leg was wholly satisfactory, and that the broken bones apparently were forming a proper and satisfactory union, although the truth was that the X-ray photograph showed only a "little callus present," and that there was "a delayed union or coming to a nonunion." The defendant continued a treatment which, in plaintiff's case, at that time, was "conjectural and speculative," and he failed to inform plaintiff that there was another method of treatment, available in a not distant city, which was more likely to result in a union of the broken bones than the treatment that was being given.

As said, the only question presented on this appeal is whether the evidence is sufficient to sustain the verdict. As we view the evidence it was, and is, sufficient to warrant the jury in finding that the defendant failed to perform the duty which he owed to the plaintiff, and that because of such failure on the part of the defendant, the plaintiff suffered detriment. Comp. Laws 1913, § 7139. If the defendant, on July 5th, had informed the plaintiff of the true condition of the broken bones, as shown by the X-ray photograph taken on that day, and had further informed him as to the method of treatment that was most likely to effect a union of the broken bones, the plaintiff could, and prob-

ably would, have obtained such treatment some three months earlier than he did, and thus been spared at least three months of expense, pain, and suffering.

Judgment affirmed.

Burr and Burke, JJ., concur.

Morris, J. (dissenting). This action was pleaded and tried as a malpractice suit. The trial court told the jury that it was a malpractice action and instructed them accordingly. The testimony of the witnesses is undisputed. I differ with my associates as to the conclusions to be drawn from this testimony and the result arrived at under the law applicable to the case.

The only expert witness was Dr. Fortin who operated on the plaintiff. He testified at length, upon direct examination as a witness for the plaintiff, and was cross-examined extensively by the defendant.

When Dr. Fortin performed the operation he found that the fibula had united and that there was a nonunion of the tibia. He testified that the normal healing period for a fracture of both bones of the leg was from six to eight weeks. He examined the three X-ray pictures taken by the defendant on April 2, June 2, and during the first part of July. The first picture showed the broken bones in apposition with some contact. He approved of the early treatment given by the defendant, including the application of a cast and instructions to the patient to stay in bed for thirty days. He said that the cast should be permitted to remain on from six to eight weeks. The cast was left on from April 2 to June 2, when the second pictures were taken. He testified it was then proper to remove the cast in order to make an examination of the progress of the healing process. With regard to the second picture he testified that it showed little callus. He testified regarding the treatment to be given at that time and said that he would immobilize the leg longer and instruct the patient to walk around with the aid of crutches bearing some weight on the injured leg.

At the time the second picture was taken the defendant removed the cast, made an examination and then immobilized the leg further by applying half of the cast and binding the leg up again by winding gauze around it. Thus it appears that the treatment given by the de-

fendant was in accordance with the practice approved of by Dr. Fortin.

Dr. Fortin was shown the X-ray picture taken during the first part of July over three months after the injury. This picture indicated that nature had not thrown down callus in the process of healing the fractured tibia, although the fibula appeared to have united. When asked what should be done, he testified, "There is no set course for that. You might treat the leg without a cast or you might put another cast on it or splint, or you might operate and put new bone in there and try to make nature throw down callus. There is no one set way of doing that."

After this witness had had his attention called to the testimony of the plaintiff to the effect that plaintiff had indicated to the defendant that his leg was pliable at the fracture, Dr. Fortin said, "At that time we know there is a delayed union or developing nonunion and that, of course, with a bone bending a man cannot put very much weight on it. He can put some weight on it with a splint on the leg or as he testified yesterday with an ace bandage immobilizing that, and with light weight bearing, it would be perfectly all right if in his judgment that would be enough to hold it." Dr. Fortin does not criticize the treatment given or indicate that the defendant should have done anything other than what he did in the treatment of the injury. He further testified that the point at which the fractures occurred is known as a nonunion area and that while nonunions are rare, the point at which these fractures occurred is one of the places where nonunions are most frequent. After testifying that he thought the treatment was proper, Dr. Fortin said, "I cannot see why that did not throw down callus and unite into a bony union."

Thus it appears from the testimony of Dr. Fortin that the practice followed by the defendant was proper. Despite that fact, the plaintiff on this appeal contends that there is evidence enough in this record to support the verdict of the jury. He cites the case of Whitson v. Hillis, 55 N. D. 797, 215 N. W. 480. In that case the defendant failed to discover a fracture of the leg during a period of two months, but treated his patient for a fracture that did not exist. The doctor suggested that an X-ray picture was not necessary and none was taken. No physician other than the defendant testified in the case. This court held that despite the absence of medical testimony in behalf of

the plaintiff, the evidence was sufficient to sustain a verdict of the jury and said, "that the failure to employ available and well-known means of diagnosis, coupled with the failure to locate a known fracture and the continued treatment for a fracture at a place where there was no fracture, is evidence of negligence." That case recognizes the general rule that expert testimony is necessary to establish the failure of a physician to exercise such reasonable and ordinary care, diligence, and skill in treating a patient as are ordinarily exercised by physicians practicing in similar localities in the same general line of practice. Cases may arise in which the negligence or want of skill of the physician is so plain that it is readily discernible by the layman. In such cases it is sometimes permissible to dispense with expert testimony. Such a case is Whitson v. Hillis, supra. In this case there is expert testimony given by the plaintiff's own witness which tends to establish that the practice of the defendant was proper and in accordance with approved medical standards.

We are now confronted with the query: may the verdict be sustained despite the expert testimony favorable to the defendant? This requires an examination of any evidence susceptible of being construed by the jury in favor of the plaintiff, for upon this appeal we must accept that version of the facts presented by the record which is most favorable to the plaintiff. Stoskoff v. Wickland, 49 N. D. 708, 193 N. W. 312; McDonnell v. Monteith, 59 N. D. 750, 231 N. W. 854. The evidence must be examined in the light of the rules applicable to cases of this kind. These rules, supported by an abundance of authority, are stated in McDonnell v. Monteith, supra, to be as follows: "First, the burden is on the plaintiff to establish by competent evidence actionable negligence on the part of the defendant and damages proximately resulting therefrom. . . . Next, a physician is required to exercise only such reasonable and ordinary care, diligence, and skill in treating his patient as are ordinarily possessed and exercised by physicians practicing in similar localities in the same general line of practice. . . . A patient cannot recover in an action against his physician for damages for malpractice if he has not conformed to all reasonable directions of such physician or if his conduct has contributed to the injury upon which the action is based. . . .

In the absence of evidence to the contrary it will be presumed that a physician and surgeon in treating his patient exercised a reasonable degree of care and skill. . . . A physician is not liable for malpractice merely because of a bad result and is not an insurer of a correct diagnosis or correct treatment. . . . Where the proofs disclose that one of several proximate causes might have been responsible for the result complained of and the jury can only conjecture or speculate as to which was the cause of such result, a verdict for damages therefor cannot be sustained." (Periods denote omitted citations.)

Returning to a consideration of the record, it appears that the result was not what either the physician or the patient had expected or hoped for. Under the rules heretofore quoted a bad result does not establish liability of a physician for malpractice. Such a result is not of itself evidence of negligence and will not support a verdict. Brant v. Sweet Clinic, 167 Wash. 166, 8 P. (2d) 972; Hair v. Sorenson, 215 Iowa 1229, 247 N. W. 651; Hanners v. Salmon, 216 Ky. 584, 288 S. W. 307, 26 N. C. C. A. 77. The doctrine of res ipsa loquitur has no application in a malpractice case and an unfortunate or bad result does not supply proof of negligence. Gallagher v. Kermott, 56 N. D. 176, 216 N. W. 569.

It is unfortunate for the plaintiff that his leg did not heal. We cannot transform that misfortune into a liability on the part of the defendant without a proof that he is in some measure to blame for the result. Sympathy alone is not a substitute for evidence. There being no failure on the part of the defendant to properly treat the injury, no liability arises out of the treatment.

The plaintiff places great emphasis on the fact that when the cast was removed and the plaintiff demonstrated to the defendant that his leg was pliable, the defendant said that it was all right only that it would take more time. This statement is more in the nature of a prognosis than a diagnosis. According to Dr. Fortin's testimony the condition of the leg at this time would indicate a delayed union. There was still a possibility that the bones might properly unite. He said, "At times a bone doesn't grow together, as we occasionally see. If it has not grown together in a period of from three to six months we call it a delayed union, and anything over a period of six months we call

it a nonunion." In Landoski v. Mueller, 193 Wis. 570, 214 N. W. 329, it was held that the fact that a physician was too optimistic in his prognosis could not be charged against him as an element of negligence. In the case before us it does not appear that any injury resulted to the plaintiff from the failure of the defendant to tell him that the condition of his leg at that time was due to a delayed union or that a nonunion might result. It does not appear that either the delayed union or nonunion was the result of anything the defendant did or did not do. The mere existence of either condition is not evidence of negligence or breach of duty on the part of the physician.

Among other allegations of the complaint the plaintiff sets forth, "That three months after plaintiff first treated the same, and after examining said broken leg, the defendant informed this plaintiff that the injured limb was coming along all right and was in good condition and that it was properly set and joined and was healing, thereby deceiving this plaintiff into continuing under the care and treatment of this defendant, when this defendant should have known if proper, regular, and careful examination and treatment had been given, that the said broken limb had not united and never had been correct."

As previously said, the plaintiff has wholly failed to sustain any allegations with regard to improper treatment, however, it does appear that about June 20 while the plaintiff was receiving treatment from the defendant, the defendant said that "the break was coming along fine and the callus was getting stronger" and that "it looked good." Again about the 12th of July the defendant told the plaintiff that his leg was coming fine. About September 17 the defendant examined plaintiff's leg through a fluoroscope. The plaintiff also looked through the fluoroscope and commented that he thought the bones were a little too far apart and asked the defendant what he thought of it. The defendant said that it was all right. In about two weeks the plaintiff consulted other doctors and was informed that the tibia had not formed a union. In about two days the plaintiff went back to the defendant's office and told him that these doctors had decided to operate. The defendant then advised the plaintiff to go to Dr. Fortin, which the plaintiff did on October 10.

The question now is whether the allegations of the complaint and the plaintiff's testimony to the effect that the defendant deceived him

by informing him that his injured leg was healing properly when in fact it was not, is sufficient to sustain the verdict of the jury. This is not an action for deceit. It was tried as a malpractice action and the instructions of the court were based wholly upon the theory of malpractice. There is a dearth of authority on the question of whether the failure of a physician to truthfully inform the patient of his condition constitutes such a breach of duty as to make the physician liable in a malpractice suit. The case that points most strongly toward such liability is Lewis v. Dwinell, 84 Me. 497, 24 A. 945, wherein a physician was held liable for failure to advise his patient of the existence of a severe rupture of the perineum. In sustaining liability of the doctor the court said, "He either failed to discover the lesion while she was under his care during her sickness at and for some weeks after the birth of her last child, or, discovering it, concealed it from her."

On the other hand, cases may be found that deny the right of recovery in malpractice cases where the physician has misinformed the patient. In Netzel v. Todd, 24 Ohio App. 219, 157 N. E. 405, the court said, "We are of the opinion that the evidence did not disclose that there was any fraud committed which would give rise to a right of action independent of malpractice. It does not constitute a cause of action for a physician to make false representations that he has removed one of the patient's kidneys, where the physician is not guilty of any act of malpractice in failing to remove the kidney during an operation or in his treatment of the patient in connection therewith."

The case of Hedin v. Minneapolis Medical & Surgical Institute, 62 Minn. 146, 64 N. W. 158, 35 L.R.A. 417, 54 Am. St. Rep. 628, quoted in the majority opinion, was an action for deceit and not for malpractice. The plaintiff in that case sought to recover $500 paid for medical treatment and obtained from him "through false and fraudulent representations to him that certain injuries from which he was then suffering were curable, and that at the Institute they could and would cure him for that amount of money." The court states that "to sustain such an action it must be shown that a false representation of a material fact has been made, in ignorance relied upon, and that damage has ensued." The jury awarded the plaintiff a verdict for $500, being the amount that he had been fraudulently induced to pay.

No damages were sought or awarded as a result of treatment given or omitted or statements made during the course of treatment. Both the nature of the action and the facts are wholly different from the case at bar.

If we assume that it is a breach of duty on the part of the physician to fail to inform or to misinform his patient as to his true condition, that assumption alone will not sustain the verdict. The plaintiff must not only prove such breach of duty, but must also prove that he has been damaged thereby before he can recover from the physician. Only those damages which flow from the breach of duty can be recovered. If there are no damages there can be no recovery. According to the testimony of Dr. Fortin, the normal healing period for an injury such as that sustained by the plaintiff is from six to eight weeks. If the bones are not grown together during the period of from three to six months it is called a delayed union, and after six months if the bones have not grown together it is called a nonunion. The inescapable implication of this testimony is that up to six months there is a possibility of obtaining a union although the bones have not grown together within the normal period. The operative method is resorted to in cases of nonunion. There is nothing in this record to indicate that any other procedure or method would or should have been resorted to during the period that the plaintiff was under the defendant's care or that the plaintiff would have sought the services of another had he been fully informed of the failure of his injury to properly heal. The fact that it did not heal and that he suffered pain, inconvenience, and loss of time from the injury does not constitute a basis of recovery for damages growing out of the failure of the doctor to inform him of the failure of the healing process. Whether damages resulted from the defendant's breach of duty is wholly speculative. Speculative damages are no more recoverable in malpractice cases than in other damage cases. "The universal and cardinal principle is that the person injured shall receive a compensation commensurate with his loss or injury, and no more." Sutherland, Damages, § 12. The whole record, when considered in the light most favorable to the plaintiff, is insufficient to warrant the jury in finding that the plaintiff suffered injury from any act of omission or commission of the defendant with

relation to his duty as plaintiff's physician. The motion for judgment notwithstanding the verdict should have been granted.

Nuessle, Ch. J. (dissenting). I am unable to agree with all that is said in the foregoing opinion written by Judge Christianson, or with the result he reaches. I do agree with the proposition of law stated in the third paragraph of the syllabus. I think, however, while it was the duty of the defendant to advise the plaintiff as to the real facts with respect to the condition of his leg, nevertheless it does not appear from the record that plaintiff suffered any damage because of defendant's failure to do so. However, it may be plaintiff can make proof of such damage, and for that reason I think that while the evidence in the present record is not sufficient to sustain the verdict, there should be a new trial in order to enable plaintiff to make such proof if he is able to do so.