## Hanners v. Salmon.

(Decided November 16, 1926.)

### Appeal from Boyd Circuit Court.

1. Physicians and Surgeons.—Evidence held not to justify submission to jury issue of negligence in setting broken leg.

2. Physicians and Surgeons.—Law presumes that physician did his duty and burden is on plaintiff in malpractice suit to prove want of reasonable care and skill.

3. Physicians and Surgeons.—In malpractice suit, gross culpability need not be proved; any failure to exercise proper care or neglect in discharge of duty being sufficient.

4. Physicians and Surgeons.—In malpractice suit, burden is on plaintiff to prove that injury resulted from defendant's want of care or skill, and bare possibility of such result is insufficient.

5. Physicians and Surgeons.—Unsuccessful result of physicians treatment of patient does not shift from latter burden of proof or of going forward in malpractice suit.

6. Negligence.—Where evidence is as consistent with absence as existence of negligence, case should not be left to jury.

7. Physicians and Surgeons.—Gist of malpractice suit is negligence, which is not shown by proof of unsuccessful result as reasonably attributable to other causes.

J. S. FULLERTON for appellant.

DYSARD & MILLER for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Affirming.

James A. Hanners on August 2, 1922, received an injury in which his left leg was broken between the knee and hip joint. He was taken to the King's Daughters' Hospital, where his leg was set and treated by Dr. J. M. Salmon. On September 26, 1923, he brought this action against Dr. Salmon, alleging in his petition that eight weeks after he received the injury defendant directed that he be removed from the bed and placed in an invalid chair, and on the third day that this was done his leg was broken again, which was the result of the unskillful conduct of the defendant in handling the case and not in the exercise of that care and skill generally exercised by physicians of ordinary care and skill in the community; that the defendant then reset the leg and treated the injury, but in so doing he did not use ordinary care and skill, and as a result of his failure to use such care and skill the plaintiff's leg was not properly set or cared for and by reason thereof the parts were not properly united; the length of the leg was shortened and plaintiff was made permanently a cripple and suffered intense physical pain and mental anguish.

The allegations of the petition were denied by answer; the case came on for trial before a jury. At the conclusion of the evidence for the plaintiff the court peremptorily instructed the jury to find for the defendant. The plaintiff appeals.

The evidence for the plaintiff as to the second breaking of his leg is in these words:

"The nurse went to take me out of the bed and my limb broke over, it broke so quickly I never knew

how it broke. I don't suppose the nurse knew how it broke. I can't say whether the nurse supporting me twisted me or how it is, I just didn't know, it was done so quickly."

This is all the evidence there is as to how this break occurred eight weeks after the first injury, and there is no evidence that any directions which the doctor gave at that time were not the usual or proper instructions.

He also testifies that the doctor was later sent for and reset the leg; took several pictures of it with X-ray and finally discharged him after about thirty days; but that the leg was a half inch shorter than the other leg and was of absolutely no use to him; it was smaller than the other and without any strength and gave him a great deal of pain. He does not complain of anything that was done to his leg before the second break occurred.

He also introduces Dr. A. J. Bryson, who testified that he examined the plaintiff's leg with an X-ray and that that leg was shorter than the other; that the break was an oblique break; that the fractured ends of the bone were in apposition but the parts of the bone were not touching and not in alignment; that it was not a very good result; but he also stated this:

"In spite of all our efforts we are not always able to obtain perfect results in fracture work however hard we attempt."

And he said this occurred in hospitals having all the facilities and in spite of the best care sometimes with such injuries.

Dr. W. T. Flannigan testified, in substance, the same facts as to the nature of the original fracture and that the leg was one-half inch shorter than the other. He said:

"The broken fragments were in apposition against the raw surface, something like this the picture shows; there is some shortening with the proper union and the amount varies. The medullary canal was not connected, but there was some circulation there."

He also testified that bad results are more liable in the case of a person more than fifty years old than in a younger person, and that the results are pronounced

good by authorities where the bone is united so that the patient can use it and the shortening is not more than half an inch; that the large muscles in the upper thigh pull so on the upper third where this break occurred that it is very hard to hold it absolutely in position until it is united, and that such results as in Hanners' case occur often with the most skillful physicians and with the most skillful treatment and the utmost care; that Hanners, before his injury, had varicocele, and this may have had something to do with this leg being smaller than the other.

Dr. S. C. Smith testified to the same facts as to taking the X-ray. He also testifies that the original fracture ran obliquely across the shaft of the bone in the upper third between the knee and the hip, leaving a sharp end on each of the bones, and that the bones as shown by the X-ray overlapped and that the result was bad. Being asked if that result could have been avoided by proper treatment he answered:

"That would embody the circumstances of that case; I don't know anything about the circumstances of the case; everything being normal it should have been in a better condition."

Being asked if there was anything in the case to indicate that the physician had been negligent he answered as follows:

"I am unable to state about that; I don't know the circumstances attending upon the injury and treatment of the case; I don't know the nature of the injury; I don't know the method of the treatment and any handicap he had; all I know is the result as it was made."

Dr. F. L. Allen testified that as shown by the X-ray pictures there was some overlapping of the bone; that it looked to be about an inch or more; that the medullary canal would not connect in such a condition. Being asked if the result was such as skillful treatment should have obtained he answered:

"Well, I know nothing of the case, this is new to me; I know nothing of the injury or nothing of the treatment of the case or the treatment he received, neither have I made any examination of him

since and the only information I have is this picture, so I could not say how skillful the treatment was that he received.''

He also said he dreaded that fracture more than any other in the body; that it was considered the worst fracture to treat because the muscles were so liable to override the bones and that it required a continual traction to keep them from overriding. He also said this:

''All I can say is the bone is not in apposition, there is an overlapping of about an inch or so; the medullary canal is not in apposition; the bone ought to be on the other side.''

Being asked if he found anything in the condition showing that Dr. Salmon's treatment was in any way negligent he answered:

''As I have said, I have no way of knowing, I don't know anything about Dr. Salmon's treatment. I never saw the case, know nothing of the case, and I don't know how well he treated him.   Dr. Salmon is a man of good ability and I imagine he would give him good care.''

There is an absolute want of evidence that Dr. Salmon did anything that he should not have done or omitted anything that should have been done.   The evidence only shows that Hanners, who was over 50 years, was left in a very deplorable condition, but it also appears that before he was injured he had varicocele and that he suffered an injury that not infrequently produce in men over fifty years of age the result that followed.

The well settled rule in such cases is thus stated:

''The law accords the medical practitioner the presumption that he has done his duty and, in a suit for injuries caused by alleged malpractice, the burden is on the plaintiff to prove the want of reasonable and ordinary care or skill.   However, it is not necessary in an action against a physician or surgeon for unskillfulness or negligence to prove gross culpability on his part; proof of any failure to exercise proper care or any neglect in the discharge of the duty assumed is sufficient.   Further, the burden is on the complaining patient to prove that the injury

complained of resulted from such want of care or skill. A bare possibility of such result is not sufficient. The burden of proof is not shifted by showing that an unsuccessful result has attended the treatment of the patient by the physician. Nor does the unsuccessful result of the case shift from the plaintiff to the defendant the burden of going forward." 21 R. C. L., p. 406.

"Where the evidence is as consistent with the absence as with the existence of negligence, the case should not be left to the jury." 30 Cyc. 1588.

What should be the rule when it is shown that the result obtained is not the result that may reasonably be expected where ordinary care and skill are used, is not presented by the record and is not decided, for there is nothing in the evidence showing that the condition in which the patient was left is other than may reasonably be expected, although proper care and skill were used. The gist of the action is negligence, and negligence is not shown where only the result appears and this result may as reasonably be the result of other causes as of the want of proper care and skill. To hold otherwise would be to place upon the defendant the burden of showing the absence of negligence, when the plaintiff had shown no facts sufficient to show negligence. The court, therefore, properly, under the evidence, instructed the jury peremptorily to find for the defendant.

Judgment affirmed.