## Williams v. Tarter.

May 23, 1941.

O. B. Bertram for appellant.

Curtis & Curtis for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Appellant, plaintiff below, as administrator sued appellee and Dr. Popplewell, charging that in attendance upon his wife in parturition they so negligently and improperly treated her as to cause her death.

Issue was raised by an answer, which denied the charges. The petition was dismissed as to Dr. Popplewell. After proof was introduced the court, upon appellee's motion, directed a verdict in his favor, and from judgment dismissing petition appeal is prosecuted. Grounds urged for reversal, substantially stated, are that the court erred: (1) In sustaining objections to competent and relevant evidence offered by plaintiff; (2) in overruling plaintiff's objections to incompetent evidence brought forward by defendant; and (3) in directing a verdict for defendant.

By lay proof it was shown that prior to August 16, 1938, expecting his wife to be confined, appellant had arranged for Dr. Tartar to attend her. In the early morning of the 16th, Dr. Tarter, who lived five miles distant, was called and arrived at the home about 7:30. Parties who were present informed the doctor that she had suffered convulsions prior to his arrival, and the first thing he did was to give her a "shot of medicine from a glass container," and afterwards administered a second hypodermic. These witnesses say that Dr. Tarter examined her heart and took her blood pressure, and said he "found no trouble there."

It was apparent to all that the condition was serious, and Dr. Tarter suggested that Dr. Popplewell be called, and upon arrival he was advised of previous conditions. The husband suggested that if they couldn't save her he would take her to the hospital. It developed that the nearest hospital was thirty miles distant. Witnesses say that the doctors said they "could take care of her here," and they proceeded, at times administering chloroform and other drugs. The child, with considerable difficulty, by use of forceps, was finally delivered, and witnesses say that the doctors left "in a hurry and said she was getting along all right." The proof shows that the two doctors were with the patient for more than two and a half hours, and both, according to plaintiff's witnesses, remained at the home for about forty-five minutes after delivery. The child lived, but the mother died shortly after departure of the doctors.

Relatives of Mrs. Williams, who were present at the time, together with some neighbors, testified that when Dr. Tarter had made his examination, and learned of the convulsions he expressed doubt that she could be saved. This witness, as did the husband, testified as to times, procedure and administration of drugs, but were of the opinion that the attending physicians left the home too soon after delivery. They say that Mrs. Williams was having hemorrhages, and that the doctors should have known this fact. The doctor, when departing, left Mrs. Williams in charge of relatives and her mother with directions as to such attention as he thought necessary.

The instructions were carried out, but evidently, as we read the testimony, Mrs. Robinson came to the conclusion that Mrs. Williams was about to go into convulsions. Dr. Tarter had informed those present that he had to visit another patient, whom they knew, and how he could be reached, and suggested that "if there was anything they didn't understand to call him." When he was called he came back hurriedly, but the patient was dead, as the doctor says, "because of the shock," principally due to eclampsia, a toxic poisoning of the system, which all the doctors, including Dr. McLendon, agreed caused convulsions.

The foregoing fairly outlines the evidence of lay witnesses who were present at the home, except to add that Mr. Williams said that when the doctors left, Dr. Tarter told him that "she was getting along all right." Dr. Tarter says that he did stay some time after delivery upon Mr. Williams' suggestion, but declined to remain and have dinner because he was due to visit another patient.

The question as to whether there was actionable negligence, in malpractice cases, depends upon the testimony of those learned in the profession of medicine, and in order to establish the case appellant called Dr. McLendon, who had a wide experience in parturition cases. It is altogether unnecessary for us to go into details of Dr. McLendon's testimony, but giving it the closest consideration it may be summed up by saying, under heavy pressure, he would not undertake to say that the use of chloroform or thytuitary, in the manner, and as frequently as deposed by lay witnesses,

was such as not ordinarily used by physicians under like circumstances.

In this respect and as to the procedure adopted in delivering the baby, this witness uniformly answered the questions by the assertions: "This would depend upon the symptons of the individual case, and I would say the doctor in the case would know what quantities to give." As to how the medicines should be administered, and with what frequency, Dr. McLendon said: "The doctor in attendance would be the only one to know. It depends entirely upon what stage of labor the patient is in." The several questions answered by the doctor, upon which appellant bases his proof of negligence, may be summarized thus:

"From your general practice and from your general knowledge of practice in this county, I'll ask you if it would be regarded as ordinary skill and an ordinary way to practice medicine in this county, if called upon to attend a mother in child-birth, and you found she was suffering from spasms and was unconscious, and you began to administer medicine that would eventually produce unconsciousness, and continue to use that medicine; for instance chloroform, which would tend to and produce more unconsciousness and make the patient unconscious entirely, and in that condition after the birth of the child you would walk off and leave the mother in that condition, is that considered ordinary skill."

The doctor answered "No." Again:

"In labor cases when you attend a patient and they were unconscious when you went to see them, and you used medicine to put them to sleep in order to relieve suffering and aid in childbirth, is it customary to leave a patient in that condition when they are suffering and flooding to an extent that it was dangerous and liable to result in death in any case?"

The doctor answered:

"I don't know the general practice; all I can say is that it is not my mode of practice."

Without giving this hypothetical question too close scrutiny, it may be said it does not state all the facts,

nor undertake to state fairly those stated. In the first place the doctor did not at "once walk off." The proof of appellant is that both doctors remained for more than forty-five minutes, and they say they remained one and a half hours after delivering the baby. It is true that one lay witness says that Mrs. Williams was "having hemorrhages bad when he left," but it is apparent from this witness' statement that the reason Dr. Tarter was called the last time was because she thought the patient about to have another convulsion. It does not appear whether or not this occurred. She says that she did not know whether or not Dr. Tarter undertook to stop the hemorrhages. He left and said she was "all right."

As to the unconsciousness, or its production by the use of medicine, which no doubt is ordinarily given for that purpose in such cases, this same witness who was left with others in charge, was positive that Mrs. Williams had had three convulsions between six or seven o'-clock, and the time Dr. Tarter arrived, and she said Mrs. Williams didn't know anything "from the first convulsion until she died." This witness did say the bleeding "was bad," but there was nothing in the testimony to indicate that the flooding was dangerous, unusual or to such an extent that death was liable to ensue because of this condition. The question did not suggest in any manner the expressed opinion of the doctor, and as testified to by all appellant's witnesses; the doctor, as had his assistant, found her in such condition that it was very doubtful if the mother could be saved, due to the trouble which was causing the frequent convulsions.

However, we need not pursue this discussion further, since it was nowhere shown that anything that was done, or left undone, was likely to cause Mrs. William's death, and Dr. McLendon was inclined to the opinion that death was due to toxic poisoning. He said, "She was not in good condition because there was some cause for her having eclamptic fits. * * * I would say that when he examined her before labor, immediately before, that she was bound to have same condition, not necessarily in the blood, to cause eclamptic fits." Dr. McLendon said that in childbirth cases where the mother has convulsions "they die in spite of all the doctors can do."

Dr. Tarter testified in substance that he had suggested to Mr. Williams that he bring his wife to his office for examination. He did not comply with the suggestions. When he reached the home the patient was in a convulsion, and he learned that she had already suffered two. To prevent recurrence he administered ¼ grain of morphine, hypodermically, but in a short while she had another convulsion; he suggested assistance; Dr. Popplewell was called, and in the meantime he administered two c. c.'s of magnesium sulphate in the muscles. She had no further convulsions until after Dr. Popplewell arrived. An examination divulged that parturition was progressing, but the doctors agreed that more dilatation was necessary, and administered thytuitary. She was unconscious during the entire time. Dr. Popplewell used the forceps, and Dr. Tarter administered chloroform to prevent a recurrence of convulsions. Dr. Popplewell looked after the baby and Dr. Tarter took charge of the mother. He examined her and found the uterus properly contracted. He examined her periodically and remained with her an hour and a half after the baby was delivered. After birth he administered ½ c. c.'s pituitary to control bleeding, and regulate contraction of the uterus.

Dr. Tarter says when he arrived and looked at the patient he knew she was in a critical condition. When he left he administered a heart stimulant, which he says could not have been repeated within three or four hours. He said since patients sometimes remain unconscious a long period, had he remained he could have done nothing for the patient. He and Dr. Popplewell agreed that it would have been dangerous, certainly due to the distance to be travelled, to undertake the trip to the hospital. Of cases that die in childbirth 15% die because of convulsions, due to a toxic condition. The doctor sums up by saying, "Had we remained at her bedside we could not have saved her or prolonged her life; we had already done everything that medical science knew. We left nothing undone." Dr. Popplewell corroborated Dr. Tarter, and said the treatment given was the usual and customary treatment in the community, and said that Mrs. William's death was due to the toxic condition.

There is accord on the part of contesting counsel

as to the controlling rules in malpractice cases, as laid down in Miller v. Blackburn, 170 Ky. 263, 185, S. W. 864, and cases cited. Appellant's counsel cites and relies on the Miller v. Blackburn case, and a California case to be later noted, and in which the rule is stated that it is not only the physician's duty to devote to his patient his best skill and attention, but not to leave a patient precipitately, without making arrangements which might be reasonably concluded to accomplish favorable results.

However, there are other rules which are as sound as those relating to the doctor's duty. One is that the doctrine of res ipsa loquitur has no place in a case of this nature. A mere failure to effectuate a cure does not raise the presumption of want of proper care, skill, or diligence upon the part of a physician. This is made clear in Hazard Hospital Co. v. Combs' Adm'r, 263 Ky. 252, 92 S. W. (2d) 35, 37, as well as in the Blackburn v. Miller case, supra, and others which might be cited. In the instant case, insofar as the proof adduced by appellants concerned it, the theory is that Mrs. Williams died very soon after the departure of the attending physicians, hence negligence.

Counsel for appellant lays down the premise that the only question to be answered is "whether or not the appellee was guilty of negligence in the practice of this case," and we agree, but the real question is, whether or not the doing of anything by the doctors, or the leaving anything undone, which is required of a physician when he undertakes the task, was the proximate cause of the death of Mrs. Williams. Hazard Hospital Co. v. Combs case, supra. Accepting the testimony of the lay witnesses to the fullest extent, accompanied by the expert testimony of Dr. McLendon, we fail to find any proof that death was due to any factor except the shock coming at a time when the patient's condition was not such as to meet it. Even if the rule of res ipsa loquitur applied, "it is difficult to see how, under any circumstances, it could supply the absence of proof of the specific negligence charged in (the) case." Hazard case, supra; Meador v. Arnold, 264 Ky. 378, 94 S. W. (2d) 626; Stacy v. Williams, 253 Ky. 353, 69 S. W. (2d) 697; Rose v. Sprague, 248 Ky. 635, 59 S. W. (2d) 554. In Barnett's Adm'r v. Brand, 165 Ky. 616, 177 S. W. 461, where a physician

failed to remove a gauze pad from a wound, and did not exercise reasonable care, we held that in order to recover it must have further appeared that such failure was the proximate cause of death. See also Kirby's Adm'r v. Berea College, 196 Ky. 353, 244 S. W. 775; Powell v. Galloway, 229 Ky. 37, 16 S. W. (2d) 489. Many of the cases cited hold that the question of negligence is one to be determined from the proof of those learned in the profession.

It is contended that the court erred in refusing to allow appellant "to show by Dr. McLendon that if her blood and heart were in good condition, what circumstances or for what reason, or in what way spasms would be produced, in other words, what caused the spasms?" As we read Dr. McLendon's testimony it is not difficult to understand what caused the convulsions. It would be interesting to know just how the expert would have answered the question, but since no avowal was made we cannot tell whether or not the answer would have helped appellant's cause. Again the question is based on a fact which does not appear to have been true. There was no test of the blood; merely a taking of blood pressure.

It is complained that one witness was prevented from telling what answer Dr. Tarter made when Mr. Williams asked the two doctors whether they could take care of the patient in the home. The witness avowed that "after they had examined her they said they could take care of her and it would not be necessary to take her to the hospital." Why the court rejected this question we do not know; suffice it to say there was no error of substance. Mr. Williams and at least one other witness, both of whom were present, had gone into this matter fully, giving substantially the same reply, and later Dr. Tarter said the same thing, as did Dr. Popplewell, the latter giving sound reasons for not removing the patient to a distant hospital.

It is complained that the court erred in permitting Dr. Tarter to testify as to what occurred during his professional visit, and what he ascertained in his examination. Counsel relies on the provisions of sec. 2062a-24, K. S., which apparently makes communications between patient and physician privileged. Counsel ap-

proached this discussion with some embarrassment, since it is intimated that the court in writing the case of Louisville & N. R. R. v. Crockett's Adm'x, 232 Ky. 726, 24 S. W. (2d) 580, holding such communications not privileged, perhaps overlooked the provisions of the statute mentioned, supra. If there was ever ground for the doubt by reason of the facts stated, that doubt was recently removed when we wrote Boyd v. Wynn, 286 Ky. 173, 150 S. W. (2d) 648, in which we held that the exemption mentioned in the statute had relation only to such matters as arose under several particularly named subsections.

In construing them with sec. 606, subsection 4 of the Civil Code of Practice, providing that attorneys, priests and clergymen should not testify concerning communications made to them in their professional capacities, without consent, as to physicians, not mentioned in the subsection, we held the common law to be in effect, under which neither patient nor physician is allowed to claim the privileged character of the communication, thus adhering to the rule in the Crockett case, and further citing 28 R. C. L. 532, 70 C. J. 178.

Counsel for appellant cites us to one case, Lathrope v. Flood, 6 Cal. Unrep. 637, 63 P. 1007, and if the facts here were similar, we would be inclined to a view quite different from the one expressed. In that case the physician had contracted to attend a young mother in childbirth. He had insisted on the use of forceps, to which the patient vehemently objected and kept up a screaming. Her conduct "angered and disgusted" the physician so that he abruptly departed, the husband insisting on his remaining or recommending another doctor. It was late in the night. The physician refused to do either; he would not return because of the woman's conduct, and as to the other request said to the husband, "you can get any one you like. Get whoever the devil you please. I am not going back." Another doctor was called, who found the use of forceps not necessary until several hours later; the child died within eight minutes after delivery. The suit sought damages for mental pain and suffering of the mother caused by the doctor's conduct, which the court characterized as being "well-nigh to brutality," and upheld a verdict, the chief contention being that it was excessive.

We have no such case here. Before plaintiff is entitled to recover, it must be shown that the defendant was negligent; that his want of skill or neglect to do something which a physician of ordinary skill would have done, resulted in death or injury. See cases cited, supra. We wrote in Nugent v. Nugent, 281 Ky. 263, 135 S. W. (2d) 877, 883:

"When the evidence given at the trial, with all the inferences that the jury could justifiably draw from it, it is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but should direct a verdict for the defendant."

It is difficult for us to conceive that the trial court could have done otherwise than direct a verdict for appellee.

Judgment affirmed.