**Edith E. ENGLE, Administratrix of the Estate of Bruce Engle, et al., Appellants,**

**v.**

**Dr. W. F. CLARKE et al., Appellees.**

Court of Appeals of Kentucky.

April 28, 1961.

O. T. Hinton, Dan Jack Combs, Pikeville, for appellants.

E. R. Hays, William J. Baird, Pikeville, for appellees.

PALMORE, Judge.

This is a malpractice suit against two physicians. One was let out on a peremptory and the jury found in favor of the other. Plaintiff, who is the widow of the deceased patient and administratrix of his estate, appeals.

Bruce Engle, 41 years of age, entered the Methodist Hospital at Pikeville on February 18, 1957, for treatment of a respiratory infection. He was attended by Dr. W. F. Clarke, one of the appellees, who was his family doctor. He recovered in due course but remained in the hospital for surgical correction of an epigastric hernia. The operation was performed by the appellee Dr. John H. Scott, Jr., on Monday morning, March 4, 1957. The patient died at the hospital some 13 or 14 hours later, at 12:45 A.M. on March 5, 1957. A post-mortem examination disclosed the presence of an estimated two quarts of unclotted blood within the peritoneal cavity, apparently originating from the site of the surgical wound. In the opinion of the pathologist the cause of death was "hemorrhage in peritoneal cavity following operation for epigastric hernia."

Dr. Scott was assisted in the surgery by his associate, Dr. A. G. Osborne. Dr. Clarke was not present. The action against Dr. Clarke was founded on the theory that in referring the patient to Dr. Scott for the surgical procedure he did not relieve himself of the continuing responsibility ordinarily existing in the physician until he dismisses the patient or notifies him that he is withdrawing from the case. Hence it is contended that Dr. Clarke should have been present during the operation and should also have cared for him thereafter.

The cause of action was directed to negligence (a) in performing the surgery and (b) in postoperative care. Only the latter of the two was submitted to the jury, as the trial court found there was no substantial evidence of negligence in the surgery itself.

■ Consider first the surgery. The utmost possible inference from plaintiff's evidence is that the internal hemorrhage heretofore mentioned most likely proceeded from what is known as the round ligament of the liver (the cord-like remnant of the obliterated umbilical vein), which, when encountered as it was in this case, is severed (or else dissected free from the herniated peritoneal sac) and tied off. Dr. Scott testified that this ligament was about the size of a safety match and that he dissected it free from the peritoneum and placed on it a single ligature of catgut, tied in a square knot. There was no evidence to the effect that this was not a customary and conventional technique unless it can be found in the following testimony by Dr. Warren H. Proudfoot, another surgeon:

"Q. Doctor, when that round ligament is encountered in an epigastric hernia repair and it is required to be severed in the operation, what do you customarily do once it is severed? Do you tie it off or anything? A. Yes, you tie it off and tie it off well because in the average individual it has an excellent arterial supply of circulation for some reason—we don't know just why, but in all major surgery when we encounter it, we always doubly tie it off; that is, with two ligatures, because we are always worried about one coming off and the patient possibly bleeding.

"Q. You say you tie it off with two ligatures rather than one ligature? A. Rather than one because we worry about the possibilities of one ligature maybe slipping and the patient possibly bleeding. We do know that it has a very adequate arterial supply in the average person. Now, some people it is not and other people it may be more so."

■ The "standard of knowledge, skill, and required care which physicians must possess and exercise * * * is such reasonable and ordinary knowledge, skill, and diligence as physicians in similar neighborhoods and surroundings ordinarily use under like circumstances." Walden v. Jones, 1942, 289 Ky. 395, 158 S.W.2d 609, 610, 141 A.L.R. 105; Stacy v. Williams, 1934, 253 Ky. 353, 69 S.W.2d 697, 704; Stevenson v. Yates, 1919, 183 Ky. 196, 208 S.W. 820; Burk v. Foster, 1902, 114 Ky. 20, 69 S.W. 1096, 24 Ky.Law Rep. 791, 59 L.R.A. 277. But note that Dr. Proudfoot was not asked and consequently did not undertake to say what was ordinary or customary in the community, or in similar communities. (As a matter of fact, his experience before coming to Pikeville in May of 1958 apparently did not embrace any similar community.) Without any evidence in this respect there was no basis on which the jury properly could have found Dr. Scott negligent in failing to use more than one ligature. See 41 Am.Jur. 205 (Physicians and Surgeons, § 87); 70 C.J.S. Physicians and Surgeons § 43, p. 950.

Dr. Edwin T. Thorsness, who performed the autopsy, said there was a small opening in the peritoneum, through which he

could put his finger, indicating that the suture ligature closing off the abdominal cavity after amputation of the herniated peritoneal sac may have slipped somewhat. This would have allowed for inward leakage of any blood that may have been present or escaped the vascular system in the proximity of the operative site following the slippage. Again, however, there was no evidence that this circumstance indicated negligence. On the contrary, Dr. Thorsness expressed the opinion that the operation was performed in the usual and customary manner. It was also established without contradiction, and admitted by Dr. Proudfoot, that postoperative hemorrhage may occur despite exercise of the highest degree of skill.

In Butts v. Watts, Ky.1956, 290 S.W.2d 777, 779, it was held that a case of malpractice can be proved without expert testimony "where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." See also Neal v. Wilmoth, Ky.1961, 342 S.W.2d 701. We do not believe, however, that the principle may reasonably be applied to the slipping of a suture.

It follows that the trial court's refusal to instruct on negligence in the performance of the operation was proper.

On the question of postoperative care the plaintiff produced a substantial case, but the jury found for Dr. Scott. We cannot, of course, substitute our judgment for that of the jury, so in this respect it remains only to determine whether Dr. Scott was negligent as a matter of law, in which event the trial court should have sustained plaintiff's motion for a directed verdict and submitted the case to the jury for assessment of damages. The test is whether "the evidence is so clear and convincing that reasonable minds would not differ in their conclusions therefrom." Droppelman v. Willingham, 1943, 293 Ky. 614, 169 S.W.2d 811, 814; Middleton v. Partin, Ky., 347 S.W.2d 75. Let us briefly review the salient events.

The patient was returned to his room at 11:00 A.M. Whether Dr. Scott visited him during the next two or three hours is in dispute but is not material. In any event, he charted orders for postoperative medications. The patient did not have a special nurse but received excellent attention from the hospital personnel. At 3:00 P.M. he was nauseated and was given dramamine. At 4:00 P.M. Mrs. McReynolds, the supervising nurse on duty from 3:00 P.M. to 11:30 P.M., was concerned over his progress. He was cold and clammy, pale, restless, and sweating profusely. McReynolds telephoned Dr. Scott at his office. He instructed her to go ahead and give the patient a medication (dramamine) and said he probably would come to the hospital later in the afternoon. Glucose also was administered at this time, and blood pressure stood at 120/80. The patient again was nauseated at 5:00 P.M., and at 6:00 P.M. his color was still more pallid; he was cold, in an anxious state, and there was a 10-point downward change in blood pressure. According to McReynolds, she telephoned Dr. Scott again, and was told he would be there later; meanwhile she was to watch the patient and give him more dramamine. McReynolds said, but the doctor denied, that during this conversation he remarked that the patient was "just scared; I know the whole family."

Although the nurse's bedside record shows this second telephone call as having been made at 6:00 P.M., Dr. Scott insists that it was about 9:30 P.M., at which time he was making his rounds at another hospital in the vicinity. That the patient was given levodromoran (not dramamine) at 6:00 and dramamine at 9:40 may tend to support the doctor's testimony in this respect, but is very doubtful.

The patient's condition worsened noticeably as time wore on. Between 7:00 and 8:00 P.M. McReynolds was unable to find any blood pressure. He was gray, "the

worse pale I ever saw," short of breath, or breathing excitedly, and thirsty. His pulse was "fair." Attempts to reach Dr. Scott by telephone were unavailing. Both McReynolds and Mrs. Engle, the patient's wife, were distraught. At Mrs. Engle's suggestion McReynolds at 9:00 P.M. telephoned Dr. Clarke, the family physican, reporting the situation to him. He directed her to give the patient his prescribed medication (dramamine), to put him under oxygen, and to keep trying to reach Dr. Scott. Dr. Clarke told McReynolds he would come to the hospital if needed, and asked her to report back to him. Ten or more telephone calls still did not locate Dr. Scott. The bedside record shows that McReynolds reported to Dr. Clarke at 9:40 P.M. and that dramamine was administered. Dr. Clarke was contacted again at approximately 10:30 P.M., and at this time, while McReynolds was talking to him over the telephone, Dr. Scott finally made his appearance.

Immediately on his arrival Dr. Scott saw the chart and proceeded to examine the patient. He observed him to be in a state of "early shock," with blood pressure of 80/50. He ordered glucose and a blood count from the hospital laboratory. He says that he at once considered the possibility of internal hemorrhage, but on completion of his examination concluded instead that the patient was suffering from a pulmonary embolism. At this point, in order to simplify this narration, suffice it to say that certain remedial procedures applicable to shock and loss of blood might aggravate a condition resulting from a pulmonary embolus, and vice versa. For this reason, Dr. Scott testified, he cancelled the glucose order and gave intramuscular antibiotics "in anticipation of a pneumonic process, which would probably be the outcome of a pulmonary embolus," but did not administer anticoagulants. Oxygen was continued. Dr. Scott remained in the hospital, though not at the patient's bedside, until shortly after midnight and then went home. The inference to be drawn from his testimony is that in his judgment he had done for his patient all that he could do. At 12:40 A.M. nurse Soblotski (who had relieved McReynolds) thought the patient was worse and telephoned Dr. Scott at home, and in accordance with his directions further drugs, including a stimulant, were administered immediately. The patient died at 12:45 A. M.

That a physician is not an insurer of the correctness of his judgment, when exercised in good faith, is an accepted principle. 41 Am.Jur. 217–218 (Physicians and Surgeons, § 103). Whether he was negligent in making a diagnosis "must be determined in the light of conditions existing and facts known at the time thereof, and not in the light of knowledge gained through subsequent developments." 70 C. J.S. Physicians and Surgeons § 48, p. 961. Dr. Proudfoot himself, plaintiff's only expert witness in this phase of the case, testified that it is "difficult to determine" when a patient is losing blood in the peritoneal cavity. Other testimony given by Dr. Scott and his witnesses amply supports that opinion. Accepting plaintiff's evidence most favorably, still it is quite clear that defendants' evidence created a substantial issue of fact as to whether the diagnosis and course of remedial action pursued by Dr. Scott upon his arrival and examination of the patient were negligent. Certainly he cannot in this respect be ruled negligent as a matter of law. It was the province of the jury to say.

We come ultimately to the question of whether as a matter of law Dr. Scott was negligent in failing to keep in touch with his patient throughout the evening of March 4, 1957, in failing to seek consultation with other professional opinion, or in leaving the hospital while the patient admittedly was still in a state of shock and obviously in critical condition. We have no hesitation in eliminating the necessity of consultation in the absence of a conclusive showing that it was customary in the circumstances. The rest is a closer

question. Shall we, a court of lawyers, lay upon the medical profession an inflexible injunction to be accessible at every moment for a given period of time following the performance of surgery, and never to leave the side of a patient in shock or critical condition? Or is this sort of question essentially for the jury? The answer is not free of doubt, and in such a case the traditions of our juridical system, tested and approved by settled public acceptance, impel us to say that Dr. Scott was entitled to have the matter resolved by a jury of his peers.

 It is contended that the case against Dr. Clarke also should have been submitted to the jury. The theory is that he was never discharged by and never dismissed the patient, hence continued to be responsible. Cited in support are several cases of abandonment. But we do not have here any question of abandonment. Dr. Clarke treated the patient for a respiratory ailment, and he recommended surgical correction of the hernia. Mrs. Engle says that although Dr. Scott was going to be "connected with" the operation she did not understand that he would be in charge, or that Dr. Clarke would not be present. On the other hand, she twice testified that she had left the matter of the surgery up to Dr. Clarke and her husband, that whatever they decided was all right with her. Though both husband and wife signed an authorization for the operation (in which the name of the surgeon was not designated), the patient himself was the contracting party. The crucial point, therefore, is not what she understood, but what was understood between her husband and Dr. Clarke. It was incumbent on the plaintiff to show what the agreement was, and on this question the record is silent. Where a patient has recovered, without complications, from the ailment his physician undertook to treat, and the physician refers him to a surgeon for an operation, it cannot reasonably be presumed, in the absence of evidence so indicating, that his responsibility under the original physician-patient relationship carries over to the surgical case.

Importance is attached by plaintiff to Dr. Clarke's bill showing inclusive dates of service from "2–18 to 3–4." However, the bill clearly showed also that charges were made for a total of 14 days, which if beginning on February 18, the day of admission to the hospital, would have ended on March 3. We do not consider this bill, made out on March 18, 1957, of sufficient probative force (as an admission) to take the question to the jury. Hence it follows that, even if newly discovered after the trial, it would not require the court to direct a new trial. See Clifton v. McMakin, 1942, 288 Ky. 813, 157 S.W.2d 81, 83, and cases collected under New Trial, ⬀108(1), West's Kentucky Digest.

One of the grounds given in support of the motion for new trial was the misconduct of a juror in failing to respond correctly on voir dire. The contention is completely refuted by the transcript.

Judgment affirmed.