James JOHNSON, Adm'r of Estate of Celie Johnson, Deceased, Appellant,

v.

Darrel L. VAUGHN, Appellee.

Court of Appeals of Kentucky.

June 7, 1963.

Rehearing Denied Oct. 11, 1963.

Russell S. Armstrong, Evansville, for appellant.

Geo. R. Effinger, Paducah, Leo King, Henderson, for appellee.

STANLEY, Commissioner.

The appeal is from a judgment from a directed verdict for the defendant, Dr. Darrel L. Vaughn, in an action for negligence and malpractice, charged to have been the proximate cause of the death of Celie Johnson. The plaintiff claims three categories of negligence on the part of the defendant, namely, improper treatment, abandonment of the patient at a crucial time and unreasonably delaying consent for another physician to attend him. Our question is whether the evidence introduced by the plaintiff was insufficient as a matter of law to submit the case to the jury.

Celie Johnson, a 46-year-old colored man, had been shot in the neck and promptly taken to the Methodist Hospital in Henderson about one o'clock in the morning of April 8, 1961. A nurse called Dr. Vaughn, a surgeon, to attend him, and the doctor arrived soon thereafter. His deposition, which had been taken for discovery, was read by the plaintiff. He therein testified that he found the man had a punctured trachea (windpipe, in layman's language) and a bullet lodged in the back of his neck, just above his shoulder. The patient was bloody, breathing with difficulty, vomiting, in "borderline shock," and in a critical condition. The testimony as to the time intervening the doctor's arrival and the removal of the man out of the emergency room to a ward room varies, but it was probably fifteen or twenty minutes. The doctor and an orderly undressed him and put him to bed.

■ Johnson's son James had taken him to the hospital in an ambulance and remained there throughout the night. He and George Swope, another patient in the same room, testified that Dr. Vaughn was in the room only once. George Mays and his wife were at the hospital all night because of having a very sick child there. They were near the emergency room and the ward. Both testified that they did not see the doctor go in or out of the ward room after the wounded man was taken in. These three witnesses and Swope described Dr. Vaughn's condition and actions as that he was "red-eyed," "stumbled," "wobbled," "staggered," "talked rough" and was "thick tongued." The son smelled the odor of alcohol on the doctor's breath and expressed the view "he had been drinking." Objections were sustained to questions asked the other witnesses as to their opinion regarding the doctor's being intoxicated. This was error. Howard v. Kentucky Alco-

holic Beverage Control Board, 294 Ky. 429, 172 S.W.2d 46. By avowals the witnesses stated the doctor seemed to be under the influence of liquor. It is fair to say that the hospital attendants who were asked about it testified they saw no indication that the doctor had been drinking.

Dr. Vaughn's deposition contains testimony of his constant attendance and diligence in the care of the patient until 3:45 A.M., and that is borne out by the nurses' charts. One chart (Exhibit B) was made currently and another (Exhibit A), which is somewhat more detailed, was written up the following night. Its trustworthiness and competency are doubtful. Dr. Vaughn testified to having administered hypodermically anticoagulents and sedatives in the emergency room. The charts show that Johnson had been admitted to the hospital at 2:15 o'clock, which is not in accord with all the other evidence. They list in illegible writing three or four medications administered there, but apparently there is some contradiction between this record and the doctor's testimony.

In the course of the doctor's testimony as to the condition of the patient on his arrival, he stated that he realized that he had a serious emergency and that he wanted him kept quiet until he could get blood to combat shock. On the doctor's order, about three o'clock the hospital laboratory technician was called from his home to come and prepare for a blood transfusion. Dr. Vaughn testified he would not "take a chance on slipping a tracheotomy tube into his trachea" until he got the blood to combat shock. He stated he was told before he left the hospital that it would be thirty or forty minutes until it would be ready. But according to the laboratory technician, the blood was ready and the equipment placed in the patient's room before Dr. Vaughn left. It was not used. Dr. W. P. Woods, a physician of experience, who resided in Evansville, testified that transfusion of blood has a tendency to prevent or "help a person out of shock if they are in shock,"

and, from the conditions described, this patient needed it promptly. In short, Dr. Woods' testimony was that good medical practice of a reasonably careful and prudent physician and surgeon in Henderson and similar communities required that under the conditions described there should have been a blood transfusion as soon as possible.

A "tracheotomy set" was moved into the room, but Dr. Vaughn did not deem it necessary to use it, as the patient had then relaxed. This preparation was for the purpose of making an incision and inserting a tube in the windpipe, which would have prevented air from escaping through the small bullet hole into the body and causing emphysema and embolism. Dr. Vaughn testified, "My idea was to put the tracheotomy tube in the hole that was already in the trachea." There was professional evidence, however, that proper procedure required cutting the windpipe at a more suitable location in order to insert the tube, and that such operation should not have been delayed.

The foregoing describes in summary the conditions when Dr. Vaughn left for home about 3:45 o'clock to change his clothes, he having come to the hospital with his outer garments over his pajamas. He deposed he regarded the patient as improved and in a satisfactory condition. He told the hospital supervisor he was going and asked her to call him if the patient's condition became worse and he was needed. He stopped on the way home for coffee, and, apparently, there was a period of thirty minutes before he reached home.

Roy Johnson, another son of the patient, and George Swope, a patient in the same room, described the wounded man's struggles and difficulty in breathing at the time the doctor left and his getting worse. An orderly put side bars on the bed, and someone, unidentified, placed him in an oxygen tent. Dr. Kissinger, referred to below, testified, in substance, that where a patient's condition is serious and could change for

the worse in a short time, a doctor should remain with him or arrange for another physician to attend the patient.

It does not appear that any effort was made to reach Dr. Vaughn at his home after he left the hospital. Instead, Roy Johnson had a nurse call Dr. Charles C. Kissinger. He arrived about four o'clock. The doctor described the man's serious condition. He was "in shock," and had "bubbling blood within the bronchical tubes and coming out of his mouth" and "subcutaneous emphysema," which is air under the skin, and also in his neck and chest. The doctor said, "I felt the man was dying at the time."

When he had ordered the patient's removal to the emergency room, Dr. Kissinger learned that Dr. Vaughn had been in charge; and he advised the family that as a matter of professional ethics they would have to get the patient released to him by Dr. Vaughn. Dr. Kissinger described his dilemma; and while it appears that he gave such attention as appeared to be most urgent, he told the sons they should telephone Dr. Vaughn and get him to release the patient.

A nurse then called Dr. Vaughn at his home, and he asked to speak to Dr. Kissinger. The latter testified he told Dr. Vaughn the patient was dying and that something had to be done. Dr. Vaughn was irate and vulgar. He told Dr. Kissinger he was "a louse" to steal his patient and then hung up the receiver. Roy Johnson then called Dr. Vaughn and asked him to release his father to Dr. Kissinger. The son's account of the conversation and Dr. Vaughn's abuse and raving covers more than two pages of the transcript. At the end, the doctor demanded at first that the sons pay him $25 and then $50 "right now" before he would release the patient. He finally agreed to wait until nine o'clock the next morning for his money. Thirty or forty minutes had elapsed.

An X-ray of the man was made by a technician some time during the night, the hour not being shown. Dr. Kissinger testified it had been taken before he arrived, but the X-ray technician's record showed he had ordered it. Dr. Kissinger, however, examined the X-ray films before starting to operate. Dr. Matthews, the hospital radiologist, exhibited the X-ray films in a view box and explained them to the court and jury. In short, they indicated the presence of "a fairly large amount of air under the skin in the tissues, both the muscles and tendons and various other structures in the neck which would not normally be present."

The patient was given blood and an anesthetic, and Dr. Kissinger began operating on him about five o'clock, trying, as he testified, to save the man's life. The operation was the only chance. He made an incision in the windpipe and put in a tube. The patient stopped breathing. His chest was opened and his heart massaged, but it did not respond. Johnson's death was caused by air escaping through the hole in his windpipe and getting into his blood, causing an embolism around his heart.

There is evidence that a perforated trachea is not necessarily fatal but that proper surgical practice and treatment of such a wound, in accordance with usual surgical procedure and carefulness, required more than was done by Dr. Vaughn. With proper treatment and attention, according to the professional witnesses, the jury could reasonably believe this man would have recovered.

Dr. Vaughn's deposition contains justification and evidence of proper treatment and care, and a jury could well find for him. We are concerned here only with such parts as were favorable to the plaintiff's case. There were substantial contradictions between what he testified was proper and necessary and what he actually did.

Much law has been written on negligence and malpractice of physicians and surgeons, and the parties here have been diligent in citing it.

It is familiar law that errors of judgment in the treatment of a patient do

not render a physician or surgeon responsible for injurious consequences, provided he had informed himself of the facts by proper investigation. Meador v. Arnold, 264 Ky. 378, 94 S.W.2d 626; Engle v. Clarke, Ky., 346 S.W.2d 13. But a doctor engages to treat a patient with care, skill and knowledge, and is held accountable for negligence or carelessness or inefficiency, one or all. The reasonableness of the skill, care and attention is gauged by the standards ordinarily possessed and observed by members of the profession engaged in the same line of practice in the same or a like locality. And, in a large degree, it is dependent upon the nature and circumstances of the particular case. The duty to be performed is according to the exigencies of the case and proportionate to the dangers to be ˙apprehended and guarded against. If a doctor fails in the observance of his duty and obligation to his patient, he is liable for the proximate result. Stacy v. Williams, 253 Ky. 353, 69 S.W.2d 697; Steinmetz v. Humphrey, 289 Ky. 709, 160 S.W.2d 6; Merker v. Wood, 307 Ky. 331, 210 S.W.2d 946; Engle v. Clarke, supra, Ky., 346 S.W.2d 18; 70 C.J.S. Physicians and Surgeons § 45, p. 954.

The burden of proof in a malpractice case is, of course, on the party charging negligence or wrong. That must be established by medical or expert testimony unless the negligence and injurious results are so apparent that laymen with a general knowledge would have no difficulty in recognizing it. Stacy v. Williams, supra; Butts v. Watts, Ky., 290 S.W.2d 777; Engle v. Clarke, supra.

We have evidence in this case of two aspects of negligence. One is improper treatment of the wounded man, and the other is in leaving the patient unattended at a critical time when the doctor's services were needed and unreasonably preventing another doctor from attending him promptly.

On the first proposition, the recitation of the evidence reflects proof by lay witnesses of some degree of negligence as a practical matter. It also reveals technical evidence of negligence in the testimony of Drs. Kissinger and Woods. Indeed, while Dr. Vaughn's testimony, given in his deposition read to the jury, was that the medication he gave and treatment he administered were proper according to the generally approved practice, there was proof, factual and inferential, that he did not actually do those things, or some of them. The jury could believe that Dr. Vaughn was intoxicated so that his faculties and efficiency were impaired.

The second proposition:

It is a rule of general acceptance that a physician is under the duty to give his patient all necessary and continued attention as long as the case requires it, and that he should not leave his patient at a critical stage without giving reasonable notice or making suitable arrangements for the attendance of another physician, unless the relationship is terminated by dismissal or assent. Failure to observe that professional obligation is a culpable dereliction. McGulpin v. Bessmer, 241 Iowa 1119, 43 N.W.2d 121; Note 6, 70 C.J.S. Physicians and Surgeons § 48, p. 966. An unwaranted lack of diligence in attending the patient renders the doctor liable for the consequences. 41 Am.Jur., Physicians and Surgeons, §§ 72, 100; Norton v. Hamilton, 92 Ga.App. 727, 89 S.E.2d 809, 57 A.L.R.2d 426; Annotations, 60 A.L.R. 664; 57 A.L.R. 2d 379; 70 C.J.S. Physicians and Surgeons § 48f(2), p. 966. We have recognized this rule in Miller v. Blackburn, 170 Ky. 263, 185 S.W. 864; Stacy v. Williams, supra, 253 Ky. 353, 69 S.W.2d 697; Williams v. Tarter, 286 Ky. 717, 151 S.W.2d 783, 784; Butts v. Watts, supra, Ky., 290 S.W.2d 777. The case of Engle v. Clarke, supra, Ky., 346 S.W.2d 13, 18, ·presented a similar question of whether a surgeon was negligent in leaving the hospital while his patient was in a critical condition, and we held it was for the jury to decide. As above recited, Dr. Kissinger testified that this obli-

gation of a doctor is recognized by the profession, and his testimony, in effect, was that the duty was violated by the defendant in this case.

We take note of Ricks v. Budge, 91 Utah 307, 64 P.2d 208, Note, 13 A.L.R.2d 144. There the defendant doctor had refused to continue treatment of the plaintiff unless he satisfied an old account. The plaintiff was in an urgent need of medical attention and was being prepared for an operation. It was held it was a question for the jury whether the plaintiff suffered damages by the defendant's refusal to treat him. Obviously, our case is different, although there are similar factors. The defendant here did not refuse to continue treatment, but there is evidence that he left the patient at a critical time and unreasonably delayed releasing him to another surgeon that he might perform an imperative operation to try to save his life.

In Thaggard v. Vafes, 218 Ala. 609, 119 So. 647, a patient had become desperately ill, apparently from reaction to his doctor's improper treatment, and other doctors were called in but refused to treat the patient in the absence of his physician. In a malpractice action there was evidence of a nurse that she had phoned the doctor several times during the day and informed him of his patient's critical condition and begged him to come to see him, but the doctor did not come until the nurse sent a car for him. He arrived a short time before the patient died. The evidence was held competent as it tended to show a culpable disregard of the physician's duty and a lack of interest in the patient's welfare. The court held as properly refused a certain charge to the jury to the effect that the failure or refusal of the defendant to visit the patient after being called could not be the basis of the verdict. The judgment for the plaintiff was affirmed.

■ Though the question of negligence on this aspect is closer than on the first, on the defendant's motion for the peremptory instruction the plaintiff is, of course, entitled to the most favorable inferences and con-

struction of which the evidence is fairly and reasonably susceptible; and if that tends to support the cause of action, the case should be submitted to the jury. Terrell v. Southern Ry. Co., 225 Ky. 645, 9 S.W.2d 993. We think that whether the defendant was guilty of negligence or a breach of duty to his patient in the respects described was a question for the jury. Engle v. Clarke, Ky., 346 S.W.2d 13; 70 C.J.S. Physicians and Surgeons § 63, pp. 1011, 1016; § 64, p. 1017.

■ We turn to the matter of proximate cause. That is, of course, an indispensable element of culpable negligence which must be established. Often there is difficulty in proving causation in malpractice cases because the proof rests largely upon the technical nature of the subject matter involved. Ordinarily, but not always, expert evidence is necessary to support the conclusion of causation. Hanners v. Salmon, 216 Ky. 584, 288 S.W. 307; Donoho v. Rawleigh, 230 Ky. 11, 18 S.W.2d 311, 69 A.L.R. 1135; Stacy v. Williams, 253 Ky. 353, 69 S.W.2d 697; Meador v. Arnold, 264 Ky. 378, 94 S.W.2d 626; Steinmetz v. Humphrey, 289 Ky. 709, 160 S.W.2d 6; Annotation, 13 A.L.R.2d at page 31. It is generally held that circumstantial evidence may be sufficient to prove reasonable probability or proximate cause where the evidence reasonably establishes a causal connection between the alleged negligence and the injury. 41 Am.Jur., Physicians and Surgeons, § 131; Annotations, 59 A.L.R. at p. 890; 13 A.L.R.2d at p. 28. There was such character of evidence in this case as a practical matter and, as well, the professional opinion of Dr. Kissinger on the point.

On the whole case, as made out by the plaintiff's evidence, we are of opinion that a jury could reasonably have found the defendant to have been negligent in either or both respects and that his negligence was a proximate cause of Johnson's death. Therefore, it was error to direct a verdict for the defendant.

Judgment is reversed.

PALMORE, J., not sitting.