RENDERED: APRIL 19, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0127-MR

PHILIP EDWARDS                                                   APPELLANT

                     APPEAL FROM JEFFERSON CIRCUIT COURT
v.                      HONORABLE JULIE KAELIN, JUDGE
                     ACTION NO. 15-CI-002026

ANDREW W. LOGSDON                                  APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ECKERLE, JONES, AND KAREM, JUDGES.

JONES, JUDGE: Following a jury verdict and pursuant to a December 6, 2022, final judgment of the Jefferson Circuit Court, Philip Edwards was awarded compensatory damages from appellee Andrew Logsdon for injuries he sustained in a vehicular accident due to Logsdon's negligence. Edwards now appeals, claiming he is entitled to a new trial due to what he asserts were the circuit court's errors in

precluding him from seeking punitive damages and introducing certain evidence at trial. Upon review, we affirm.

## BACKGROUND

On May 3, 2013, Philip Edwards was operating his motorcycle on Rodman Street near Churchill Downs. It was "Oaks Day" – the day before the 2013 Kentucky Derby – and Edwards was on his way to the racetrack, looking for a place to park. Andrew Logsdon, who was driving a golf cart on Rodman Street in the opposite direction, veered in front of and collided with Edwards, causing Edwards to sustain injuries. On April 29, 2015, based on the foregoing, Edwards sued Logsdon in Jefferson Circuit Court for negligence and negligence per se. Logsdon initially denied liability for causing the accident. In his amended answer of September 3, 2019, Logsdon then admitted fault, but maintained that he had no knowledge regarding the extent of Edwards' injuries and, thus, continued to dispute that aspect of Edwards' negligence claims. On October 31, 2019, Edwards then amended his complaint to add a claim of punitive damages for gross negligence, alleging Logsdon had been intoxicated at the time of the accident. Logsdon filed another amended answer shortly thereafter denying Edwards' new allegations; and on June 11, 2020, he moved for partial summary judgment in that regard.

Through an interlocutory order of October 13, 2020,[1] the circuit court granted Logsdon's motion for partial summary judgment regarding Edwards' claim for punitive damages. Edwards' remaining claims were tried in November 2021. In conformity with the jury's verdict, the circuit court entered a final judgment on December 6, 2022, awarding Edwards a total of $11,999.34 for his past medical expenses and pain and suffering due to Logsdon's negligence. Thereafter, Edwards appealed. Additional relevant facts will be discussed in our analysis below. In sum, Edwards now argues he is entitled to a new trial because, in his view, the circuit court erred by: (1) summarily dismissing his punitive damages claim; (2) precluding him from adducing certain evidence at trial; and by (3) rescinding a post-trial order that vacated its final judgment of December 6, 2022. We will address these points in that order.

## ANALYSIS

**1. The circuit court did not err by summarily dismissing Edwards' claim against Logsdon for punitive damages**.

A defendant who causes injury to another due to their own intoxication may be held liable for punitive damages in an ensuing action for gross negligence. *See, e.g.*, *Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998). Summary

---

[1] The circuit court's partial summary judgment regarding punitive damages remained interlocutory until the remainder of Edwards' claims against Logsdon were resolved following the later jury trial. *See* Kentucky Rule of Civil Procedure (CR) 54.02.

judgment may also be granted solely on the issue of punitive damages. *See, e.g., MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324 (Ky. 2014). "The standard of review on appeal of a summary judgment is whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law." *Pearson ex rel. Trent v. Nat'l Feeding Systems, Inc.*, 90 S.W.3d 46, 49 (Ky. 2002). Summary judgment is only proper when "it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). In ruling on a motion for summary judgment, the court is required to construe the record "in a light most favorable to the party opposing the motion . . . and all doubts are to be resolved in his favor." *Id.*

As discussed, Edwards asserted a claim for punitive damages against Logsdon based on his allegation that Logsdon's gross negligence, due to intoxication, caused his injuries. The circuit court summarily dismissed that claim on October 13, 2020. On appeal, Edwards presents two overarching arguments supporting, in his view, that the circuit court erred.

First, he contends there was insufficient evidence demonstrating Logsdon was *sober* at the time of the accident. In this vein: (1) he asserts the police report of the accident, which recited the investigating officer's impression that Logsdon had not been drinking, and which did not cite Logsdon for any

offense, constituted "inadmissible hearsay"; (2) he notes that if Logsdon had testified at trial and denied being intoxicated at the time of the accident, a jury would have been free to disbelieve him; and (3) he further notes that Logsdon ultimately failed to testify on this or any other point, failed to adequately answer a discovery interrogatory that asked him to identify anyone who may have witnessed the accident, and that Logsdon merely provided an unsworn answer by and through counsel – "Unknown at this time" – in response to the following discovery interrogatory:

> State whether you ingested or consumed any alcoholic beverages, prescription or non-prescription drugs within thirty-six (36) hours prior to the subject accident, and if so, give the type, quantity, duration and time of ingestion of each such alcoholic beverage and drug, and identify all individuals present at the time of consumption.

Edwards' argument lacks merit, however, because it was not *Logsdon's* burden to prove he was *sober*. Absent evidence to the contrary, the law presumes all people are sober. *See Brown v. Commonwealth*, 555 S.W.2d 252, 257 (Ky. 1977). *Edwards* had the burden of proving through clear and convincing evidence that Logsdon was *intoxicated* at the time of the accident. *See* CR 43.01; *Louisville SW Hotel, LLC v. Lindsey*, 636 S.W.3d 508 (Ky. 2021) (citing Kentucky Revised Statute (KRS) 411.184(2)) ("Given the severity of the sanction, a party seeking punitive damages must establish gross negligence through clear and convincing evidence."). True, a jury could have disbelieved any "denial of

-5-

intoxication" Logsdon might have offered at an eventual trial of that issue; but the party opposing summary judgment "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Steelvest, Inc.*, 807 S.W.2d at 481 (internal quotation marks and citations omitted).

As for his grievances regarding Logsdon's failure to testify or adequately respond to his discovery interrogatories, Edwards also has only himself to blame. In the *five years* between the date Edwards filed his complaint and the date the circuit court granted Logsdon summary judgment, Edwards never subpoenaed Logsdon for his testimony nor noticed his deposition.[2] He did not move pursuant to CR 33.01(2) to compel Logsdon to provide more adequate responses to his interrogatories. And, in response to Logsdon's motion for summary judgment, Edwards made no contention that summary judgment was

---

[2] We have found nothing of record indicating Edwards attempted to subpoena Logsdon's testimony at any point in time, but Edwards – without citation to the record – claims in his brief that Logsdon, "despite the Plaintiff's sending him a subpoena to his last known address, did not show up to *trial* to testify." (Emphasis added.) Edwards does not, however, specify when he made this attempt to subpoena Logsdon to testify; and notably, the *trial* in this matter was held from November 9 through 12 of 2021 – over a year after the circuit court had already dismissed his punitive damages claim. Edwards also voices no disagreement in his reply brief with Logsdon's representation, set forth in Logsdon's appellee brief, that "The Appellant supplemented the record on appeal to include a single subpoena that was issued by Plaintiff's counsel and received by the Louisville Metro Process Service only 4 days before the trial of November 9, 2021. The attempt to serve Logsdon failed. However, this case was filed in 2015. Trial occurred more than 6 years later. The Appellant had 6 years to subpoena Defendant Logsdon for deposition and at least 9 months to subpoena Defendant Logsdon for trial."

premature.[3] Nor are we authorized or inclined to hold *sua sponte* that the five years between the date Edwards filed his complaint and the date the circuit court granted Logsdon summary judgment was less than an adequate opportunity for Edwards to have developed discovery on the issue of Logsdon's alleged intoxication. *See, e.g.*, *Hartford Ins. Group v. Citizen's Fidelity Bank & Trust Co.*, 579 S.W.2d 628 (Ky. App. 1978) (finding six months for discovery sufficient in the circumstances).

Edwards' second argument of error is that contrary to the circuit court's holding, he *did* adduce evidence demonstrating Logsdon was intoxicated at the time of the accident. We are not so convinced.

Edwards' proof in opposition to summary judgment derived from his own lay opinion – as set forth in his June 28, 2017 discovery deposition – that what he perceived of Logsdon shortly after the May 3, 2013 accident was consistent with intoxication. Specifically, Edwards relies on six pages from his June 28, 2017 discovery deposition where, in relevant part, he testified:

Q: Tell me what happened.

---

[3] Rather than claiming summary judgment would be *premature*, Edwards offered the following argument in response to Logsdon's motion (which he does not continue pressing on appeal): "Defendant seeks to put the cart before the horse and claims without any support whatsoever that Plaintiff cannot meet his burden of proving Defendant Logsdon's intoxication by clear and convincing evidence. The trial of this matter has not yet occurred. *When it does occur, the proof of Logsdon's intoxication will be elicited*." (Emphasis added.) That argument was also meritless. "The hope or bare belief . . . that something will 'turn up,' cannot be made basis for showing that a genuine issue as to a material fact exists" for purposes of opposing summary judgment. *Neal v. Welker*, 426 S.W.2d 476, 479-80 (Ky. 1968) (citation omitted).

EDWARDS:  Well, I made it close to Churchill Downs. I believe I was probably three or four blocks away from the Central Avenue part, which is the direction I was heading towards the track, and was probably getting close to looking for a place to park the motorcycle.  And I was on Rodman and there, frankly, just wasn't a lot of traffic, except for the golf cart that eventually started coming down the road in the other direction.

Q:  All right.  How far away was the golf cart when you first saw it?

EDWARDS:  I'm not sure how much notice I took of it, to be candid; a few blocks probably.

. . .

EDWARDS:  Well, why the accident happened is because the idiot on the other side turned and hit me head on, turned left into me and hit me head on.  Before that I was simply on my motorcycle going down the street and was getting ready to look for a place to park the motorcycle as I got a little bit closer to Churchill Downs. And the streets were clear, I don't remember there being a lot of traffic at that point.  It seems like most of the people may have already gotten there and already parked their vehicles and went in.

Q:  Well, did the accident happen at an intersection?

EDWARDS:  I don't think so, I think it was just a general patch of that street.

Q:  Well, you said the fellow operating the golf cart was turning left?

EDWARDS:  He was coming my direction in the opposite lane of traffic.

Q: Do you know why he entered your lane of traffic?

EDWARDS: I personally don't know, no.

Q: Okay. Well, you said he was turning left, and did you think he was – what makes you think he was turning left? Let me ask it this way.

EDWARDS: Well, I don't think he turned left, he turned left and hit me head on. He made a left turn right in front of me and hit me.

Q: All right. Did you talk to him at the scene?

EDWARDS: Yes.

Q: Okay. What did he tell you?

EDWARDS: He was upset that I wanted him to stay there and wait for the police to show up, because he had things he wanted to go do.

Q: Well, did he stay for the police?

EDWARDS: The police found him on the sidewalk across the street after they got there and we pointed him out. He moved the golf cart before the police got there, after I told him not to.

Q: All right. Well, how far did he move the golf cart?

EDWARDS: He moved it across the street, I believe.

Q: And parked it and got out?

EDWARDS: And he was talking with some of his other friends there. And I think his water bottle disappeared while that was happening, and then the police showed up.

Q: Okay. Well, tell me about the water bottle.

EDWARDS: Well, "water bottle's" kind of a generic term, like Xerox or Kleenex. It was one of those, if I remember it correctly, one of those reusable bottles with removable lids that a lot of people just use to carry around their own drinks of water in.

Q: Do you have any reason to think that the operator of the golf cart was under the influence?

EDWARDS: My belief that he – the way he acted led me to believe that, yes.

Q: Did you smell alcohol on his breath?

EDWARDS: I was not that close. I was on the ground and unable to move or prevent him from doing anything or approach him.

Q: Was he slurring his speech?

EDWARDS: He was animated in his conduct.

Q: The police report narrative, the police officer wrote down that the operator of the golf cart stated he reached down to catch a bottle of water that fell, intense pain from the motion caused him to swerve. Do you know if that's what the golf cart operator told the investigating officer?

EDWARDS: I did not hear his conversation with the officer.

Q: Do you have any reason to dispute what the police officer wrote down in the narrative?

EDWARDS: Number one, I didn't see him with the water bottle until after the accident. All I did was see him immediately turn and hit me.

-10-

Q:  Okay.  So is it fair to say you don't know whether what the police officer recorded from the operator of the golf cart was accurate or not?

EDWARDS:  I didn't hear it, so I don't know.

Q:  And you didn't see it?

EDWARDS:  I can only tell you what I saw, yes.

Q:  Did you have any other conversation with the operator of the golf cart that we haven't already talked about?

EDWARDS:  Yes, he – well, I was initially in shock a little bit, of course, and we had some sort of words.  And I was speaking to him while a nurse who lived in the area came out to check on me.  And the golf cart operator stated something to the effect of "you're okay, I can leave now, right?"  And I remember saying to him something like, dude, you just freaking hit me.  He's like, "well, I've got things I want to go do, I need to go, so I'm going to take off."  I was like, no, stay here until the police get here.

And he's like, "well, let me move this golf cart out of the way."  I said, no, leave the golf cart where it is until the police get here.  He ignored me and moved his golf cart.  And that's when I saw somebody with the water bottle over there on the side.  And then when I saw the police report I kind of put two and two together that he was just trying to get away from the scene.  You would have to ask him why, but his conduct was very suspicious.

"Intoxication" is "[a] diminished ability to act with full mental and physical capabilities because of alcohol or drug consumption[.]"  BLACK'S LAW DICTIONARY 827 (7th ed. 1999).  It is a question of fact whether the driver of a

vehicle was so far intoxicated at the time of an accident as to affect his ability to operate it. *Whitney v. Penick*, 281 Ky. 474, 136 S.W.2d 570, 574 (1940). And to be sure, a layperson's opinion that an individual was intoxicated at a given moment can qualify as admissible, affirmative evidence of that fact. *See Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 446 (Ky. 1997), *as modified* (Feb. 18, 1999) (citing *Johnson v. Vaughn*, 370 S.W.2d 591, 593 (Ky. 1963); *Howard v. Kentucky Alcoholic Beverage Control Board*, 294 Ky. 429, 172 S.W.2d 46 (1943)). But, this is only so if the opinion is based upon reasonable inferences drawn from what the layperson perceived, rather than speculation. *See* Kentucky Rule of Evidence (KRE) 701 (requiring lay opinions to be "rationally based on the perception of the witness" and "[h]elpful to a clear understanding of the witness' testimony or the determination of a fact in issue"); *Mondie v. Commonwealth*, 158 S.W.3d 203, 212 (Ky. 2005) (citation omitted) ("Speculation by a lay witness is not helpful to the jury"); *see also O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006) ("[S]peculation and supposition are insufficient to justify a submission of a case to the jury, and . . . the question should be taken from the jury when the evidence is so unsatisfactory as to require a resort to surmise and speculation.").

Caselaw illustrates what, within the perception of a layperson, could give rise to a reasonable inference of "intoxication." Examples include articulated details of what the layperson perceived – shortly before, during, or shortly after the

-12-

incident – of the allegedly intoxicated person's (1) smell; (2) appearance; (3) behavior; and (4) ability to function or speak. Thus, in *Howard*, 172 S.W.2d 46, a layperson's opinion that various individuals were intoxicated was deemed affirmative evidence of that fact where it was underpinned by his following perceptions:

> He said he saw three persons in or about appellant's bar "who had passed out under the influence of intoxicating drinks. One was trying to jabber something or other, and they said 'just leave him alone.' He leaned his head over and went to sleep. One was stretched out in the booth." With reference to the disorderly conduct the witness testified as follows:
>
> "Q. Mr. Yancey, were there any evidence of disorderly conduct that you saw there? A. All up and down the booths they were loving and cursing. It was the worst place that I saw in the whole county. The drunks were cursing and talking very loud.
>
> "Q. Mr. Yancey, is loving women disorderly conduct? A. In the way they were doing, yes. I seen one man kissing a woman and loving her and he had his hand in the front of her dress. That was very vulgar in my estimation.
>
> "Q. And did you see other instances? A. Yes, of running their hands in dresses. The biggest part of them were drinking beer.
>
> . . .
>
> "Q. How were you able to form an opinion that these customers were intoxicated at the time they purchased beer? A. By their general actions, the stupor on their

-13-

faces, their speech, which was not at all plain English, and sometimes staggering around.

*Id*. at 48.

In *Vaughn*, 370 S.W.2d 591, lay opinions that a doctor was "intoxicated" around the time of his negligent act were deemed affirmative evidence of that fact where the witnesses described the doctor's "condition and actions as that he was 'red-eyed,' 'stumbled,' 'wobbled,' 'staggered,' 'talked rough' and was 'thick tongued.' The son smelled the odor of alcohol on the doctor's breath and expressed the view 'he had been drinking.'" *Id*. at 593. *See also Gream v. Miller*, 243 S.W.2d 502, 504 (Ky. 1951) ("Certainly the evidence of the smell of liquor on the breath of [the allegedly intoxicated individual] immediately following the accident is competent.").

In *Tate v. Borton*, 272 S.W.2d 333 (Ky. 1954), it was held that for purposes of a (now-outdated) contributory negligence defense, whether the decedent "voluntarily rode in the car knowing that the driver was under the influence of intoxicants" was a jury question. There, notwithstanding eyewitness testimony supporting that the driver was "not drunk" before and after the car accident, the decedent witnessed the driver drinking shortly before entering the vehicle; the accident occurred shortly thereafter; and neither the driver nor any other witness could explain how the driver lost control of the vehicle and caused the fatal crash. *Id*. at 334.

-14-

Conversely, in *Fort Mitchell Country Club v. LaMarre*, 394 S.W.3d 897 (Ky. 2012), our Supreme Court approved and reinstated a grant of summary judgment which had determined insufficient evidence had been adduced regarding a defendant's intoxication where no evidence indicated the amount of alcohol the defendant had consumed prior to the accident; and as articulated by the witnesses who observed the defendant prior to the accident, neither the defendant's appearance nor conduct (including the defendant's noted lack of any slurred speech) were indicative of intoxication. *Id*. at 900-01. Our Supreme Court has also explained, in the context of KRE 701, that a vague lay opinion that a defendant looked "different," was acting "real weird," and exhibited facial expressions that the witness had not previously observed of the defendant, did not prove that the defendant was high on LSD and "simply would not have been helpful to a determination of any fact in issue." *Stopher v. Commonwealth*, 57 S.W.3d 787, 799-800 (Ky. 2001).

Here, what underpinned Edwards' lay opinion that Logsdon was intoxicated at the time of their accident was: (1) his vaguely-stated perception that Logsdon was acting "animatedly;" (2) his complaint that Logsdon did not follow his directives (which Logsdon had no obligation to obey); and (3) his own suspicions aroused by the disappearance of Logsdon's water bottle following the accident – a water bottle that may or may not have contained water. Edwards

-15-

asserts that these factors, along with the facts that Logsdon's bad driving caused the accident and that the accident occurred on a Friday afternoon during Derby Week, could have caused a reasonable person to *suspect* Edwards was intoxicated at the time of the accident.[4]  But, suspicion of intoxication is the most of what Edwards' lay opinion could have offered; and suspicion, speculation, and conjecture are not evidence.  *O'Bryan*, 202 S.W.3d at 588.

Edwards presented no evidence that any scientific testing indicated Logsdon was intoxicated at the time of the accident.  He presented no evidence of any circumstance that might have predisposed Logsdon to intoxication at that time, *i.e.*, that Logsdon was observed drinking or using intoxicants beforehand, or was in possession of any intoxicants when the accident occurred.  He presented no evidence indicating the smell of Logsdon's breath; he noticed no slurring of Logsdon's speech; he presented no testimony regarding the appearance of Logsdon's eyes or any irregularity in Logsdon's gait or coordination.  And while he claims Logsdon's driving was bad, his recollection of any specifics regarding Logsdon's bad driving, as set forth in his deposition, was limited to the instant before their collision.  Devoid of reasonable inference from anything Edwards

---

[4] While asserting that a reasonable police officer could also have suspected Edwards was intoxicated at the time of the accident, Edwards reemphasizes throughout his brief that the report of the police officer who *did* investigate the accident – and concluded Logsdon had not been drinking – should be disregarded.

perceived, Edwards' lay opinion of Logsdon's intoxication was mere speculation and thus insufficient for purposes of summary judgment. The circuit court committed no error in summarily dismissing Edwards' punitive damages claim against Logsdon.

**2. The circuit court did not err by precluding Edwards from adducing certain evidence at trial**.

The trial of Edwards' negligence claims against Logsdon was held from November 9 through 12, 2021. There, the circuit court precluded Edwards from: (1) testifying that in his opinion Logsdon was intoxicated;[5] and (2) introducing evidence about – and asking the jury to draw negative inferences from – Logsdon's (a) unwillingness to admit liability until September 3, 2019, and (b)

---

[5] On page 17 of his appellate brief, Edwards states that his punitive damages "evidence" would have permitted "the jury to hear and understand the context of how the accident occurred and what was done afterwards to try to protect the scene after Logsdon moved the golf cart and tried to leave." However, Edwards was not prohibited from testifying at trial about how Logsdon *acted* at any given time. As the circuit court clarified for Edwards' counsel at the November 1, 2021 hearing (from 11:55 to 11:58 a.m.) regarding Logsdon's motion *in limine*:

> COURT: My recollection is that your client did give statements about how [Logsdon] was acting. And I think it was rapid speech or, I don't remember precisely. But none of it led to the "and therefore he was drunk." So, I think a description of how he was acting, rapid speech or whatever it was, I don't remember all that other, I think that's fine. But I don't think the leap can then be made, and your client can't testify that, "and I thought he was drunk," because there's simply nothing more than that.
> EDWARDS' COUNSEL: Then we won't do that.
> COURT: And, any alcohol intoxication, as far as damages, would have gone to punitive damages, and those are gone, so now the jury is looking purely at the non-punitive stuff. So I'm going to grant the motion with the understanding that that does not prohibit the plaintiff from testifying to what he observed.

absence from the trial. Edwards asserts the circuit court erred in doing so. In a nutshell, Edwards argues he should have been permitted to place these points at issue before the jury because *Logsdon*, in his view, unfairly impeached *his* credibility. In particular, he asserts in his brief that Logsdon "weaponized the fact that [Edwards] is an attorney in a calculated effort to discredit the severity of his injuries. Repeated references to Mr. Edwards as a plaintiff's lawyer are [sic] aimed at inflaming the passions of the jury just as surely as would be a reference to the plaintiff seeking a windfall or attempting to win the lottery in court." Edwards adds that he "attempted to point this out in his original motion for a new trial in January of 2022. [Trial Record] 570 (Def 3 First Mot. New Trial, p. 2)."

We disagree. If Edwards was upset with Logsdon's purported "weaponization" of his status as an attorney during the trial, his recourse was not to expect the circuit court to remedy the situation by permitting him to introduce his beliefs regarding Logsdon's intoxication, or Logsdon's unwillingness to quickly admit liability or attend trial. Rather, his recourse was to object to any such "weaponization" statements and request an admonition – which he failed to do below. Contrary to what Edwards represents to this Court, neither page two of his motion for a new trial, nor any other portion of his motion, contended Logsdon had

-18-

"weaponized" his attorney status.[6]  And in any event, a CR 59 motion for a new trial – Edwards' only indication of where he preserved this "weaponization" argument – is not a vehicle for raising evidentiary objections that could and should have been raised before or during trial.  *See Hopkins v. Ratliff*, 957 S.W.2d 300, 301 (Ky. App. 1997).

As for the legal authority that does apply to the circuit court's exclusion of evidence regarding Logsdon's intoxication, or Logsdon's unwillingness to quickly admit liability or attend trial, the standard for reviewing evidentiary rulings is abuse of discretion.  *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000).  "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."  *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  KRE 401.

---

[6] The portion of Edwards' CR 59 motion that came closest to Edwards' appellate "weaponization" argument is, as set forth on its second page, as follows:

> During the closing argument, Defense Counsel made numerous arguments and adverse inferences about Plaintiff seeming to pose for the photos that were taken immediately following the accident as well as the motive for taking these photos. Such arguments by the Defense directly attacked Plaintiff's credibility, especially in regard to how injured Philip was at the scene of the accident.  Had Philip been able to testify about his interactions with Defendant and other occurrence as [sic] the scene of the accident, such testimony would have bolstered Philip's testimony.

-19-

Here, none of what the circuit court excluded at trial made any fact of consequence more or less probable. As discussed, Edwards' opinion regarding Logsdon's "intoxication" was speculation, not evidence, and it bore exclusively on his punitive damages claim against Logsdon – a claim that was summarily dismissed prior to trial and thus of no consequence.

Also irrelevant were Logsdon's unwillingness to admit liability until September 3, 2019, along with his absence from the trial. This is so because Logsdon ultimately admitted liability for causing the accident and Edwards' injuries; and because Logsdon denied, in his answer, knowledge of the only other fact at issue in the trial, *i.e.*, the *extent* of Edwards' injuries. Logsdon's unwillingness to admit liability until September 3, 2019, along with his absence from the trial, were not relevant to the extent of Edwards' injuries; and "Evidence which is not relevant is not admissible." KRE 402. The circuit court properly excluded those matters from the jury. No abuse of discretion occurred.

**3. The circuit court committed no error by rescinding its decision to vacate its final judgment of December 6, 2022**.

As discussed, the jury found in favor of Edwards and awarded him $11,999.34 for his past medical expenses and pain and suffering, and the circuit court ultimately entered final judgment in conformity with that award on December 6, 2022. Edwards then moved pursuant to CR 59.01 for a new trial, claiming the circuit court had erred by summarily dismissing his punitive damages

claim on October 13, 2020; and by precluding him from testifying that in his opinion Logsdon was intoxicated, or from asking the jury to draw negative inferences about Logsdon's credibility due to Logsdon's unwillingness to admit liability until September 3, 2019, and absence from the trial. And on December 19, 2022, without any analysis, the circuit court entered a perfunctory order granting Edwards' motion and thus *vacating* its judgments of October 13, 2020, and December 6, 2022.

Three days later, Logsdon – claiming the December 19, 2022, order had been entered due to the circuit court's clerical error – moved the circuit court to set aside the December 19, 2022, order and reinstate its judgments of October 13, 2020, and December 6, 2022. And on January 10, 2023, without any analysis, the circuit court entered a perfunctory order granting Logsdon's motion and thus *reinstating* its judgments of October 13, 2020, and December 6, 2022.

On appeal, Edwards asserts the circuit court's January 10, 2023, order – which vacated its December 19, 2022, order and reinstated its prior judgments of October 13, 2020, and December 6, 2022 – was erroneous. This is so, Edwards argues, because "In Kentucky, a court speaks through the language of its orders and judgments";[7] and here, nothing stated in the circuit court's orders – and no

---

[7] *Glogower v. Crawford*, 2 S.W.3d 784, 785 (Ky. 1999) (citations omitted).

evidence of record – indicates the circuit court "believed" it had committed a clerical error when it entered its December 19, 2022 order.

However, no legal authority required the circuit court under the circumstances to explicitly state its "belief" that it had committed clerical error, or to justify any such "belief" with evidence. Also, the dispositive issue is not whether courts speak through their written orders (which they certainly do). Rather, the dispositive issue is whether the circuit court had the authority to rescind one written order with another. Here, the circuit court's December 19, 2022 order granting Edwards' CR 59 motion was interlocutory and non-final. As such, the circuit court had that authority and was therefore at liberty to revise it "at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." CR 54.02(1); *see also Tax Ease Lien Investments 1, LLC v. Brown*, 340 S.W.3d 99 (Ky. App. 2011).

Furthermore, a trial court's ruling pursuant to CR 59 "is reviewed by an appellate court under the abuse of discretion standard." *Bowling v. Kentucky Dep't of Corrections*, 301 S.W.3d 478, 483 (Ky. 2009) (citations omitted). Considering the breadth of Edwards' CR 59 motion relied upon arguments we have deemed legally meritless, we cannot say the circuit court's ultimate decision to deny it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945. No error occurred in this regard.

## CONCLUSION

In light of the foregoing, we AFFIRM.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Christopher K. Stewart
Louisville, Kentucky

BRIEF FOR APPELLEE:

Robert J. Rosing
Louisville, Kentucky